NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0640n.06

No. 09-1327

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KEITH BRANDON SMITH,

     Petitioner-Appellant,

v.

LINDA METRISH, Warden,

     Respondent-Appellee.

_____ /

FILED

*Aug 30, 2011*

LEONARD GREEN, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

BEFORE:    BOGGS, and CLAY, Circuit Judges; TARNOW, District Judge.[*]

**CLAY, Circuit Judge.**  Petitioner Keith Brandon Smith appeals the district court's order

denying Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  For the

reasons set forth below, we **AFFIRM.**

STATEMENT OF FACTS

I.     **Factual Background**

On December 31, 1999, Petitioner celebrated the new year by attending two separate parties.

The first party was held at a house shared by Petitioner's aunt, Dawn Edward, and her boyfriend

Bruce Long ("Edwards' house").  The revelers at this party drank alcohol, smoked marijuana, and

_____

[*]Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting
by designation.

used cocaine. During the party, Petitioner got into a fight with a neighbor outside, and began shooting at the neighbor. At this point Long, who had been outside with Petitioner when the fight began, reentered the house, removed a black semiautomatic gun from under the couch in the living room, and returned outside. (*See* R. 39, Trial Tr. Vol. IV 9/21/2001 at 8.)

When the fight subsided, Petitioner left the first party at Edwards' house for fear that the police would come. After spending some time elsewhere, Petitioner returned to Edwards' house, where he met his friend Jimmy Curtis, a known drug dealer. Petitioner and Curtis remained at Edwards' house only a short time, and then left to go to a second new year's party hosted by Eric Whitrock and Jason Glaum.

This second party took place at the Signature Inn in Elkhart, Indiana. Curtis supplied cocaine for this party, and like the first party that Petitioner attended, the activities at this party included drinking alcohol, and using drugs. Petitioner arrived at the second party armed with a semiautomatic gun, which he wore at his waist, and proudly displayed periodically by lifting his shirt. After remaining at the second party for approximately an hour, Petitioner stated that he wanted to go home, and Glaum offered to give Petitioner a ride back to Edwards' house. The two left in Glaum's green Ford Mustang.

Around midnight on January 1, 2000, Petitioner and Glaum returned to the party at Edwards' house. The two remained there for approximately an hour, and both drank. When Petitioner and Glaum decided to leave, Long drove them from Edwards' house in Glaum's green Mustang because both Petitioner and Glaum had been drinking.

En route, Long, Petitioner and Glaum stopped on Redfield Road in Michigan. The purpose of this stop is disputed, and at this point Petitioner's and Long's versions of what transpired that night diverge.

Petitioner testified at his trial that Long requested that they stop the car on Redfield Road to buy more cocaine, (*see id*. at 37), and that Long and Glaum exited the car, leaving Petitioner behind in the car. While Long and Glaum were out of the car, Petitioner heard gunshots, and then saw Long returning to the car. When Long got back in the car, Petitioner asked Long what happened, and Long replied, "[d]on't worry about it." (*Id*. at 38.) Petitioner stated that he and Long briefly returned to Edwards' house, where Petitioner put his gun in his bedroom. From there, Petitioner and Long proceeded back to the party at the Signature Inn. (*See id*. at 39.)

Long, however, testified that Petitioner directed him to drive to Redfield Road in order to obtain more cocaine. (R. 36, Trial Tr. Vol. II 9/19/2001 at 42.) Long explained that Petitioner and Glaum exited the car at Redfield Road, and that from his seat in the car, Long heard gunshots. Shortly thereafter, Petitioner returned to the car and instructed Long to drive. (*Id*. at 45.) Long testified that he and Petitioner proceeded directly from the murder scene to the party at the Signature Inn. (*See id*. at 47.)

When Petitioner and Long arrived at the Signature Inn, Petitioner went up to Curtis and said "[y]our boy is dead." (*Id*. at 49.) Thereafter, Petitioner and Long remained at the party for approximately ten minutes, at which point they drove two girls home from the party, and went with Curtis to dispose of Glaum's car. Petitioner and Long met Curtis at the Sherman Street Boat

Landing where Long testified that they "put the car in neutral and let it roll . . . down the boat dock . . . [i]nto the river." (*Id*. at 52.) Curtis then drove both Petitioner and Long back to Edwards' house.

Early the next morning, Petitioner and Long met at Jessica Jellison's house. Jellison was Edwards' friend, and lived across the street from the Sherman Boat Dock. While there, Long changed out of the clothes he had been wearing the prior evening, and threw them away. (*See* R. 39, Trial Tr. Vol. IV 9/21/2001 at 27.)

Glaum's body was found on Redfield Road on the morning of January 1, 2000. Glaum had been shot eight times. Police officers gathered several pieces of forensic evidence from the murder scene that day, including, nearly a dozen nine millimeter shell casings near Glaum's body. Police also found that two sets of footprints led towards Glaum's body, whereas only one set led away. After taking a cast of the set of footprints that went in both directions, police identified that the footprint had been made by a relatively new pair of size 11.5 Nike sneakers. (R. 36, Trial Tr. Vol. II 9/19/2001 at 184.)

The afternoon of January 1, 2000, Petitioner and Long met to dispose of the murder weapon. Petitioner testified that he borrowed a car, and picked Long up from Edwards' house. Long entered the car with a plastic shopping bag containing the gun and bullets. Petitioner and Long drove to Fidler's Pond, a pond near the local high school, and Long "swung the stuff into the [water]." (*Id*. at 44.)

On January 3, 2000, Petitioner was arrested for Glaum's murder at the residence where he lived with his grandmother. While arresting Petitioner, police requested, and were granted, consent to search the residence. During the search police seized Petitioner's size 11.5 Nike sneakers.

Petitioner was subsequently indicted in Cass County, Michigan for the felony murder of Glaum. Petitioner waived his Fifth Amendment rights, and agreed to talk to the police. In advance of his trial, Petitioner provided the police with ten different versions of the events surrounding Glaum's murder.

Long was also arrested. Prior to Petitioner's trial, Long pled guilty, pursuant to a plea agreement, to accessory after the fact to murder. As part of his plea agreement, Long agreed to testify at Petitioner's trial. However, during a preliminary hearing, Long perjured himself on the stand, and Long subsequently pled guilty to perjury.

## II.     Procedural History

Petitioner's trial lasted five days. On the second day of trial, Long testified against Petitioner. In his testimony, Long stated that Petitioner shot Glaum, that Long had not possessed the murder weapon at any point on the night of December 31, 1999, and that Long had not gone to Jellison's house the morning after the murder. At the start of the fourth day of trial, the prosecution discovered that the portions of Long's trial testimony maintaining that he did not possess the murder weapon on December 31, 1999, and had not gone to Jellison's house the next morning, were false. But the prosecution did not immediately disclose this information to either the trial court or the defense. During the proceedings on the fourth day of trial, Petitioner took the stand in his own defense, and asserted that Long had committed the murder. Petitioner explained that he confessed to the crime in order to protect Long.

Although the prosecution never revealed Long's perjury, between the fourth and fifth days of tiral, Petitioner's defense attorney learned as much from Long's cellmate in jail.

5

At the opening of the fifth day of trial, defense counsel made a motion before the trial court for a mistrial based on the prosecution's failure to disclose Long's perjury. The trial court expressed its displeasure with the prosecution, but denied the motion, and instead permitted the defense to recall Long as a witness to impeach his prior testimony. The defense availed itself of this opportunity, and recalled Long to testify during the fifth day of trial. After the five day trial, the jury convicted Petitioner of second degree murder, a lesser included offense of felony murder. Petitioner was subsequently sentenced to life in prison.

Petitioner appealed his conviction and sentence to the Michigan Court of Appeals, arguing that the prosecution failed to disclose Long's perjury, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The Michigan Court of Appeals denied this claim on the merits, stating, in relevant part:

> [T]he prosecutorial duty to correct perjured testimony . . . include[s] perjured testimony that relates to the witness' credibility and not just the facts of the case. In this case, it is undisputed that the witness gave false testimony at trial, but there is no evidence, and [Petitioner] suggests none, to indicate that the prosecutor was aware at the time the witness was on the witness stand that he was giving perjured testimony. However, the prosecutor was under an obligation to disclose the perjury as soon as he learned of it.

> Despite the prosecutor's failure to disclose the witness' perjured testimony, [Petitioner] did discover that the witness gave false testimony before the close of proofs. A new trial is required only if the false testimony could in any reasonable likelihood have affected the judgment of the jury. Because the witness was recalled to the stand and his perjury exposed to the jury, there is no question as to whether heating the false testimony would have affected the outcome of the trial. Therefore, we find that a new trial is not warranted.

> We reject [Petitioner's] contention that having this evidence presented before he testified would have changed his trial strategy and he would not have testified. However, the only way to neutralize the evidence against him was to claim at trial that he was not the shooter and explain to the jury why he confessed and why the forensic evidence did not necessarily implicate him as the shooter. Nevertheless, even if the witness' perjured testimony had been exposed to the jury before

[Petitioner] testified and [Petitioner] did, in fact, decide not to testify, we still conclude that the jury's verdict would not have been different. The witness' credibility was attacked throughout the trial. All instances of the witness' lying to police and perjury were presented to the jury. Therefore, the jury had the opportunity to assess what weight to give the witness' testimony. had [Petitioner] not testified, the jury would have been presented with very little evidence to substantiate [Petitioner's] claim that he did not kill the victim. Apart from witness' testimony, the forensic evidence and [Petitioner's] own confession implicated him as the shooter. Furthermore, [Petitioner's] credibility was undermined when the prosecutor presented the numerous different versions of that evening's and the next morning's events that [Petitioner] told the police. Accordingly, the trial court did not abuse its discretion in denying [Petitioner's] motion for mistrial.

*People v. Smith*, No. 237879, 2003 Mich. App. LEXIS 1384, at *2-4 (Mich. Ct. App. June 10, 2003).

The Michigan Supreme Court denied Petitioner leave to appeal.

Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on June 26, 2006. The district court referred Petitioner's habeas petition to a magistrate judge for a report and recommendation. On December 10, 2008, the magistrate judge issued a written report and recommendation, recommending denying Petitioner a writ of habeas corpus. On February 26, 2009, the district court adopted the report and recommendation, and denied Petitioner both a writ of habeas corpus, and a certificate of appealability. This Court granted Petitioner a certificate of appealability on the issue of whether the prosecutor's failure to disclose Long's perjury interfered with Petitioner's due process rights. Petitioner timely appealed.

## DISCUSSION

### I.      Standard of Review

"In reviewing the district court's decision we review legal conclusions *de novo* and findings of fact for clear error." *Haliym v. Mitchell*, 492 F.3d 680, 689 (6th Cir. 2007).

Petitioner filed his petition for a writ of habeas corpus in 2006, after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA") amendments to 28 U.S.C. § 2254. This Court's review of the state court's decision is governed by the deferential habeas standard codified in AEDPA.

Section 2254(d) states:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to . . . clearly established Federal law" pursuant to § 2254(d)(1) if "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decided a case differently than the Supreme Court on a set of materially indistinguishable facts." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). A state court decision "involves an unreasonable application of clearly established Federal law" pursuant to § 2254(d)(1) if "the state court identifies the correct governing legal principle but unreasonably applies that principle to the facts of the prisoner's case. Clearly established Federal law, as determined by the Supreme Court of the United States, refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Id*. at 763 (quoting *Williams*, 529 U.S. at 412).

The Supreme Court recently reemphasized AEDPA's important role as "part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum

8

for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770, 787 (2011); *see also Cullen v. Pinholster*, 563 U.S. __, 131 S. Ct. 1388, 1398 (2011); *Walker v. Martin*, 562 U.S. __, 131 S. Ct. 1120 (2011); *Premo v. Moore*, 562 U.S. __, 131 S. Ct. 733 (2011); *Renico v. Lett*, 559 U.S.__, 130 S. Ct. 1855 (2010). The Court stressed that the AEDPA standard "is a difficult to meet, and highly deferential standard for evaluating [state court] rulings, which demands that [state court] decisions be given the benefit of the doubt," *Cullen*, 131 S. Ct. at 1398 (internal quotations and citations omitted), and reiterated that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786.

While emphasizing the significant measure of deference that AEDPA mandates, the Supreme Court simultaneously stressed that AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. Thus, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2005).

Federal habeas review continues to serve the important role of "guard[ing] against extreme malfunctions in the state criminal justice systems," *Harrington*, 131 S. Ct. at 786, and AEDPA "preserves authority to issue the writ in cases where there is no possibility that fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id*. Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Id*. at 786-87. Therefore, in evaluating a habeas claim under AEDPA, a federal court must "determine what arguments or theories supported, or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Id*. at 786.

However, while AEDPA always requires habeas courts to accord state court decisions significant deference, the nature of the deference is tailored to the legal rule underlying that habeas claim. *See, e.g. Renico*, 130 S. Ct. at 1864. "Evaluating whether a rule application [by a state supreme court] was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington*, 131 S. Ct. at 786. As this Court has recognized, the AEDPA "deference that we must accord the state court's determination" in ineffective assistance of counsel cases "is even greater in light of the generalized nature of the *Strickland* inquiry." *Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011); *see also Premo*, 131 S. Ct. at 740 ("The *Strickland* standard is a general one, so the range of reasonable applications is substantial." (quoting *Harrington*, 131 S. Ct. at 788)); *Renico*, 130 S. Ct. at 1865 ("the standard applied . . . [namely,] whether the [trial] judge exercised sound discretion [in declaring a mistrial]– is a general one, to which there is no plainly correct or incorrect answer in this case."); *Sessoms v. Runnels*, No. 08-17790, 2011 U.S. App. LEXIS 11175, at *24 (9th Cir. June 3, 2011) ("[The petitioner's] claim therefore hinges upon our determination that the decision of the California Court of Appeal was 'contrary to, or an unreasonable application of,' the general . . . standard that an accused must have actually invoked his right to counsel  As the [Supreme] Court

has explained, this only makes [the petitioner's] task more difficult: Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." (internal quotations, citations, modification and emphasis omitted)); *Watson v. Greene*, 640 F.3d 501, 508 (2d Cir. 2011) ("Where state court decisions are guided only by general constitutional standards (as opposed to specific, bright-line rules), [AEDPA's] 'unreasonable application' standard is particularly difficult to meet, because such decisions are given particularly generous benefit of the doubt.").

The instant case addresses an alleged *Brady* violation in Petitioner's trial. The *Brady* standard at issue here is a narrow rule that mandates specific compliance from prosecutors. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Brady*, 373 U.S. at 87. Thus, the AEDPA deference accorded the state determinations in *Brady* cases is dissimilar from that accorded state court decisions applying "general constitutional standards." *Watson*, 640 F.3d at 508. AEDPA requires that habeas courts accord a double layer of deference to state courts' application of general constitutional standards, *see Harrington*, 131 S. Ct. at 786-88, by according deference both to the discretionary actions of the actors, and to the analysis of the state court. *See, e.g. Premo*, 131 S. Ct at 740 ("Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." (internal quotation marks and citations omitted)). In contrast, state court adjudications of *Brady* claims involve application of narrow principles. *See Robinson v. Mills*, 592 F.3d 730, 735-38 (6th Cir. 2010) ("The prosecutor's duty to disclose under *Brady* encompasses impeachment evidence as well as exculpatory evidence.

. . . [T]he prosecutor's actual knowledge is irrelevant because the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf . . . ."); *Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008) (explaining that *Brady* imposed a specific disclosure requirement on prosecutors, "Under *Brady v. Maryland*, the prosecution must disclose all material, exculpatory evidence to a defendant, irrespective of whether the failure to disclose was done in good or bad faith."). Thus on habeas review they are only accorded a single layer of deference. *See Moldowan v. City of Warren*, 578 F.3d 351, 388 (6th Cir. 2009) (stating that "materiality is a legal question"); *see also Haliym*, 492 F.3d at 689 (stating that this court reviews questions of law *de novo*); *Campbell v. Coyle*, 260 F.3d 531, 539 (6th Cir. 2001) (same).

There is also a second way in which AEDPA review in this case is distinct from that recently applied by the Supreme Court. *Harrington* dealt with an unexplained state court decision, and required that a habeas court faced with an unexplained denial of a claim on the merits hypothesize regarding potential reasons supporting the state court decision. *See Harrington*, 131 S. Ct. at 786. However, where, as here, the state court expressly stated its reasoning, this Court may rely on the state court's articulation of its reasons as the basis for its decision. *See id*. at 786 ("Under § 2254(d), a habeas court must determine what arguments or theories supported or as here [when the state decision is unexplained], could have supported the state court's decision"). Thus, in this case, this Court need only evaluate the reasonableness of the Michigan Court of Appeals' decision based solely on the Michigan Court of Appeals' explanation of its decision. *Id*.

This Court may only grant Petitioner a writ of habeas corpus if, applying the foregoing AEDPA deference principles, this Court finds that the Michigan Court of Appeals unreasonably applied clearly established federal law in denying Petitioner relief.

## II.    Analysis

This Court issued Petitioner a certificate of appealability on the issue of "whether [Petitioner] was entitled to relief because the prosecution failed to disclose that one of its witnesses had given false testimony prior to [Petitioner] taking the stand to testify on his own behalf at trial." *Smith v. Metrish*, No. 09-1327 (6th Cir. Jan. 13, 2010).  Accordingly, Petitioner claims that he is entitled to a writ of habeas corpus because the prosecutor failed to disclose that Long perjured himself on the second day of Petitioner's trial.  (*See, e.g.*, Br. of Pet'r at 25.)

Because the instant claim is based on the prosecution's failure to disclose that its witness had offered perjured testimony at trial, determining whether Petitioner's conviction violated his due process rights potentially implicates two distinct bodies of law: suppression of evidence in violation of *Brady v. Maryland*, *see, e.g., Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000); and structural error based on presentation of perjured testimony.  *See, e.g., Akrawi v. Booker*, 572 F.3d 252, 265 (6th Cir. 2009).

### A.    *Brady v. Maryland*

#### 1.    Legal Framework

The Supreme Court held in *Brady v. Maryland* "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."

13

*Strickler*, 527 U.S. at 280 (quoting *Brady*, 373 U.S. at 87). Thus, to establish a *Brady* violation, Petitioner must demonstrate that: (1) "[t]he evidence at issue . . . [is] favorable to the accused, either because it is exculpatory, or because it is impeaching;"(2) "[the] evidence . . . [was] suppressed by the State, either willfully or inadvertently;" and (3) the evidence in question was "material." *Id.* at 281-82. However, "[t]his Circuit has held that no *Brady* violation occurs where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source." *Byrd*, 209 F.3d at 517 (internal quotations and citations omitted); *see also Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004) ("[w]here the defendant was aware of the essential facts that would enable him to take advantage of the exculpatory evidence, the government's failure to disclose it did not violate *Brady*." (internal quotation marks omitted)).

> Regarding *Brady*'s materiality requirement, the Supreme Court has explained that
>
> favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different . . . . [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal.

*Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995); *see also Strickler*, 527 U.S. at 280. In so explaining, the Supreme Court reasoned that the

> touchstone of materiality is a "reasonable probability" of a different result, and that adjective is important. The question is not whether a defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

*Id*. at 434 (internal quotations and citations omitted).

Furthermore, the Supreme Court indicated that "[o]ne does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435. We have similarly reiterated that "[t]he question [for *Brady* materiality is] not whether it [is] likely that [the defendant's] conviction would be overturned in light of newly discovered evidence." *Jamison v. Collins*, 291 F.3d 380, 388-89 (6th Cir. 2002). Therefore, in assessing materiality under *Brady*, this Court will consider "the withheld information . . . in light of the evidence available for trial that supports the petitioner's conviction." *Jells*, 538 F.3d at 502.

> Nevertheless, the Supreme Court emphasized that the test for *Brady* materiality,
>
> is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles*, 514 U.S. at 434-35. The Supreme Court has thus clarified that *Brady* materiality is not a strictly quantitative inquiry. Rather, it is more of a qualitative inquiry in which a reviewing court must ask whether the suppressed evidence casts sufficient doubt on a petitioner's conviction that it puts the case "in a different light." *Id*.

The *Brady* materiality inquiry is further circumscribed in the context of the delayed disclosure at issue in this case. This Court has held that "*Brady* generally does not apply to delayed

15

disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Kuehne*, 547 F.3d 667, 698 (6th Cir. 2008) (internal quotation marks omitted). Delayed disclosure "only violates *Brady* when the delay itself causes prejudice." *Id.*; *see also United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006); *United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994).

## 2.  Application

Petitioner's *Brady* claim fails on both *Brady*'s suppression and materiality prongs.

Petitioner cannot show that the prosecution violated *Brady* by suppressing material evidence because Petitioner "knew or should have known the essential facts permitting him to take advantage" of the *Brady* information in this case. *Byrd*, 209 F.3d at 517. Petitioner states that during the fourth day of trial, the prosecution discovered that Long had perjured himself on the second day of Petitioner's trial when, prior to the opening of the defense case, Petitioner's counsel "informed the state about what he believed would be the subject of [Jessica Jellison's] testimony." (*See* Br. of Pet'r at 14.) Because Jellison's projected testimony conflicted with Long's, the prosecution asked a detective to interview Long to determine the veracity of the two testimonies. (*See* R. 40, Trial Tr. Vol. V 9/24/2001 at 6.) In his discussion with the detective, Long admitted that "he had lied while he was on the stand." (*Id.* at 4.) The detective related this information to the prosecution on the fourth day of trial, prior to the start of the defense's case. (*See* Br. of Pet'r at 14.)

According to Petitioner, defense counsel's report of Jellison's expected testimony aroused the prosecution's suspicions that Long had committed perjury earlier in the trial. Based on this information, the prosecution investigated further and determined that Long had lied on the stand. Petitioner admits that his counsel had access to the information alerting the prosecution to the

16

possibility of Long's perjury, and in fact informed the prosecution of the relevant facts. Because this information was "not only available to [Petitioner] but also l[ay] in a source where a reasonable defendant would have looked, [Petitioner] is not entitled to the benefit of the *Brady* doctrine." *Spikro*, 368 F.3d at 610 (internal quotations omitted).

Petitioner's *Brady* claim also fails to satisfy the materiality requirement. Petitioner acknowledges that delayed disclosure of evidence can only be material if the delay itself caused prejudice. *See Kuehne*, 547 F.3d at 698. However, Petitioner contends that he "is entitled to habeas relief because the prosecution failed to disclose that Long had given false testimony prior to [Petitioner's] taking the stand to testify in his own defense," which opened the door to introduction of evidence of Petitioner's confessions to the police. (Br. of Pet'r at 25.) Petitioner is essentially arguing that the delay itself was material because the delay caused him to waive his self-incrimination rights, permitting the introduction of additional incriminating and impeaching evidence.

Petitioner's theory is unavailing. It is well established that "upon the trial of the defendant in a criminal case, it would be a clear violation of a defendant's right against self-incrimination under the Fifth Amendment of the Constitution to compel him to take the stand, [and] testify . . . ." *United States v. Doss*, 563 F.2d 265, 275 (6th Cir. 1977). It is similarly firmly established that an individual's waiver of his Fifth Amendment rights is not considered voluntary, and thus may not be used at trial, when that waiver was induced through unconstitutional means. *See, e.g., United States v. Pacheco-Lopez*, 531 F.3d 420, 425 (6th Cir. 2008). As the Supreme Court explained, "[t]he question is not whether the petitioner made a knowing decision to testify, but why" the petitioner

made the decision. *Harrison v. United States*, 392 U.S. 219, 223 (1968). If the petitioner waived his Fifth Amendment right to "overcome" other unconstitutional evidence, then the petitioner's testimony "was tainted by the same illegality,"and does not constitute an effective waiver of his rights." *Id*. at 222-23.

The fallacy in Petitioner's argument, however, is that whether Petitioner's decision to waive his Fifth Amendment rights, allegedly to counter Long's perjured testimony, constituted a "knowing and intelligent" waiver of his Fifth Amendment right against self incrimination, *Garner v. Mitchell*, 557 F.3d 257, 264 (6th Cir. 2009), is not relevant to the instant *Brady* materiality inquiry.

*Brady* requires that a conviction to be vacated "where the [suppressed] evidence is material either to guilt or punishment." *Strickler*, 527 U.S. at 280 (quoting *Brady*, 373 U.S. at 87). The scope of this materiality question is narrow, considering only whether Petitioner was prejudiced by the information actually suppressed. *See, e.g., United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991) ("Certainly, information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes."). The inquiry does not extend to assessments of the impact that the suppression may have had on Petitioner's subsequent trial strategy. *See Joseph v. Coyle*, 469 F.3d 441, 473 n.23 (6th Cir. 2006) ("[W]e have expressly recognized the Supreme Court's explicit rejection of the argument that the materiality standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial." (internal quotations, citations, and modifications omitted)); *Bencs*, 28 F.3d at 560 ("Materiality pertains to the issue of guilt or

innocence, and not to the defendant's ability to prepare for trial."). Thus whether Petitioner's decision to testify was affected by his delayed discovery of Long's perjury is inapposite.

Absent considerations regarding Petitioner's decision to testify, Petitioner cannot demonstrate that the 24 hour delay, between the prosecutor's discovery and his discovery of Long's perjury, was material. The prosecution discovered that Long had perjured himself "during the noon recess" on the Fourth day of Petitioner's trial, which was a Friday. (R. 40, Trial Tr. Vol. V 9/24/2001 at 6.) Petitioner's defense attorney discovered the fact of Long's perjury on "Saturday morning," when "Bruce Long's cellmate . . . asked to speak to [him]." (*Id*. at 19.) During the time that elapsed, Jessica Jellison and Petitioner testified as part of the defense's case. On Monday morning, at the start of the trial's fifth day, Petitioner's counsel made "a motion for dismissal or mistrial due to prosecutorial misconduct." (*Id*. at 11.) While the trial court denied Petitioner's motion, the court permitted Petitioner to "put Bruce Long back on the witness stand and additionally expose him during the course of th[e] trial and impugn his integrity and credibility even more that it already has been." (*Id*. at 26.) Petitioner did recall Long prior to the close of the fifth day of trial, and disclose his perjury to the jury.

Petitioner alleges only that the prosecution violated *Brady* by failing to immediately disclose Long' perjury to on the fourth day of trial. Petitioner does not assert that the prosecution was aware of Long's perjury at the time of Long's initial testimony on the second day of trial. Thus, to prevail, Petitioner must show "a reasonable probability that" absent the 24 hour delay in his discovery of Long's perjury, "the result of the proceeding would have been different," *Kyles*, 514 U.S. at 433, sufficient to "undermine[] confidence in the outcome of the trial." *Id*. at 434.

19

In this case, the fact that the trial court permitted Petitioner to recall Long prior to the close of evidence, and expose his perjury to the jury, neutralized any prejudice. *See Joseph*, 469 F.3d at 472-73 (finding that a trial court's implementation of several "remedial measures to remedy the delay . . . reduced the potential materiality/prejudice of the delay"). Petitioner cannot demonstrate, and puts forth no evidence, that there is a reasonable probability that the result of the trial would have been different had Long's perjury been exposed to the jury on the fourth, rather than the fifth day of trial. Petitioner thus cannot meet his materiality burden under *Brady*. *See Bell v. Bell*, 512 F.3d 223, 237 (6th Cir. 2008) (stating that a petitioner will prevail only if he "can show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict" (quoting *Kyles*, 514 U.S. at 435) (internal quotation marks and citations omitted)).

### B.      Structural Error

### 1.      Legal Framework

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the [s]tate must fall . . . . The same result obtains when the [s]tate, although not soliciting false evidence, allows it to go uncorrected when it appears." *Naupe v. Illinois*, 360 U.S. 264, 269 (1959). The Supreme Court "has consistently held that a conviction obtained by the knowing [or uncorrected] use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). Furthermore, a prosecutor "is the representative . . . of a sovereignty whose obligation to govern impartially is as compelling as its

obligation to govern at all . . . [W]hile he may strike hard blows, he is not at liberty to strike foul ones." *United States v. Carter*, 236 F.3d 777, 786 n.4 (6th Cir. 2001) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

"A false testimony claim is cognizable [o]n habeas because the deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Akrawi*, 572 F.3d at 265 (internal quotations and citations omitted). As the state court properly found, "the prosecutor was under an obligation to disclose the perjury as soon as he learned of it." *People v. Smith*, No. 237879, 2003 Mich. App. LEXIS 1384, at *3 (Mich. 2003). Thus, the fact that Petitioner does not allege, nor is there any evidence in the record suggesting, that the prosecutor was aware of Long's perjury at the time of Long's initial testimony, *see id.* ("there is no evidence, and [Petitioner] suggests none, to indicate that the prosecutor was aware at the time the witness was on the witness stand that he was giving perjured testimony"), does not foreclose Petitioner's ability to prevail on a false testimony claim.

To prevail on a false testimony claim, Petitioner must show: "(1) that the prosecution presented false testimony; (2) that the prosecution knew was false; and (3) that [false testimony] was material." *Abdus-Samad v. Bell*, 420 F.3d 614, 626 (6th Cir. 2005). In order to satisfy the first two prongs of this test, Petitioner need not demonstrate that the prosecution presented false testimony that at the time of presentation he knew to be false. Rather, it is sufficient that Petitioner show that the prosecutor used "testimony, whether elicited or left uncorrected, that the prosecutor kn[e]w[] or should [have known] is false." *Foley v. Parker*, 488 F.3d 377, 392 (6th Cir. 2007).

In cases involving perjured testimony, "the [Supreme] Court has applied a strict standard of materiality . . . because they involve a corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104. Thus, this type of violation "is said to amount to 'structural error' that demands relief to vindicate the integrity of the judicial process, irrespective of a showing of actual prejudice." *Akrawi*, 572 F.3d at 265. Therefore, once the first two elements of a false testimony claim are satisfied, a petitioner's burden to demonstrate materiality "is less stringent than that for more general *Brady* withholding of evidence claims." *Rosencrantz v. Lafler*, 568 F.3d 577, 584 (6th Cir. 2009). The petitioner need only show that there exists "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id*. The materiality of an "omission must be evaluated in the context of the entire record." *Agurs*, 427 U.S. at 112-13 ("If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.").

### 2.      Application

Although a false testimony claim demands a lower showing of materiality than a *Brady* claim, Petitioner is nevertheless unable to prevail on this claim. In this case, the evidence implicating Petitioner was extremely strong. First, several pieces of circumstantial evidence linked Petitioner to the crime scene: Petitioner's sneakers matched the footprint found at the murder scene; Petitioner was indisputably present at the murder scene when the crime was committed; Petitioner participated in disposing of the murder weapon; Petitioner participated in disposing of Glaum's car;

and finally, although Long owned the murder weapon, Petitioner was familiar with, and had access to, the murder weapon.

Second, Petitioner made numerous voluntary confessions. The veracity of Petitioner's confessions is called into question by the fact that he offered the police ten different versions of the night's events prior to taking the stand in his own defense. However, in an unsolicited letter to the police officers investigating the case, Petitioner admitted committing the crime, and provided details that matched the forensic evidence discovered at the crime scene. (*See* R. 39, Trial Tr. Vol. IV 9/21/2001 at 86-91.) Petitioner's letter stated that when he, Glaum, and Long were in the car returning to the party at the Signature Inn, the following transpired:

> So we're on our way to the hotel when I made up a story and said [Curtis] wanted me to ask [Glaum if he] would pick something up for him. [Glaum] said yes. So I gave him directions to [a] place. I knew how to get there because I've been that way with [Curtis] before. When we get there I tell [Long] to pull over. When I get out I asked [Glaum] if he would come with me. So we begin walking thr[ough] a yard and I proceed to tell him what I want. We have words and he tried to run. I know that he's not going to run back to the car because my uncle [Long] is in there. So I started freaking out that he was going to run to one of the house[s] and call the police. So I just started shooting. Then I ran back to the car. I could see that [Long] was scared. He asked me what happened. I said just drive just drive.

(*Id.*, Ex. 68.) Petitioner's description of what transpired "matche[d] the physical condition of [Glaum's] body." (R. 39, Trial Tr. Vol. IV 9/21/2001 at 88.) Specifically, several of the bullets found in Glaum's body were fired from behind. (*Id.*) Additionally, when officers interrogated Petitioner based on the contents of his letter, he demonstrated that Glaum "was walking on [his] right side . . . that he pulled the gun, turned and fired . . . . And [Glaum's] left side was towards [petitioner]." (*Id.* at 89.) Petitioner also stated that "at one point," Petitioner "stood over [Glaum] and . . . shot until the gun was empty while he was on the ground." (*Id.*) Forensic evidence similarly

indicated that "at least th[e] last four shots" fired at Glaum "were fired when he was laying face down on the ground." (*Id*. at 90.)

Third, the content of Long's perjured testimony concerned relatively minor details. Initially Long testified, in relevant part, that he did not have a gun on the night of the murder, and denied ever possessing the murder weapon, stating, "I had a shotgun, I ain't never had no handgun." (R. 36, Trial Tr. Vol. II 9/19/2001 at 70.) When Long was put back on the stand after his perjury was revealed, Long admitted that his prior testimony regarding the murder weapon was "a lie," and that he "had actually had it in [his] possession earlier that evening." (R. 40, Trial Tr. Vol. IV 9/24/2001 at 29.)

Even after his perjury was exposed, Long admitted only to possessing the murder weapon earlier in the evening. He maintained that he was innocent of the murder, (*id*. at 39), and Petitioner's testimony that Long had committed the murders was the only evidence at trial suggesting that Long, rather that Petitioner, was the perpetrator.

Finally, while Long's perjury on the second day of the trail was only exposed to the jury when he was recalled on the fifth day, the jury was aware that Long was convicted of perjury for lying the stand during a preliminary hearing in Petitioner's case. (*See* R. 36, Trial Tr. Vol. II 9/19/2001 at 32.) It is true that each new piece of impeachment information has the potential to play a significant role in the jury's evaluation of a witness' credibility. *See Napue*, 360 U.S. at 270 (stating that a witness' perjured statements were material although the jury already knew that the witness had an incentive to lie, "we do not believe that the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one."). However, in view of all of the evidence

24

implicating Petitioner, and the additional evidence casting aspersions on Long's veracity, this single instance of perjury concerning a relatively ancillary detail, does not give rise to "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Rosencrantz*, 568 F.3d at 584.

## CONCLUSION

Petitioner's habeas corpus claim based on his delayed discovery of Long's perjury fails for three reasons: (1) Petitioner had access to the information revealing Long's perjury, and a reasonable defendant would have discovered that fact; (2) the delay in Petitioner's discovery was not material under *Brady*; and (3) even under the lower, false testimony, materiality standard, Petitioner cannot demonstrate that the suppression was material. The state court did not unreasonably apply federal law in denying Petitioner relief. *See* 28 U.S.C. § 2254(d)(1).

We therefore **AFFIRM** the district court's decision denying Petitioner's petition for a writ of habeas corpus.

**Tarnow, District Judge, concurring.**  I write to concur in result only.  In denying to issue a writ of habeas corpus, the state court did not unreasonably apply clearly established Federal law. *See* 28 U.S.C. § 2254(d)(1).