RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0180p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

DEMETRIOUS FIELDS (13-5150); CLINTON LEWIS (13-5685); MARTIN LEWIS (13-5907),

        *Defendants-Appellants.*

Nos. 13-5150/5685/5907

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:02-cr-20449—Samuel H. Mays, Jr., District Judge.

Argued: June 25, 2014

Decided and Filed: August 13, 2014

Before: SUTTON and COOK, Circuit Judges; MARBLEY, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Michael J. Stengel, Memphis, Tennessee, Appellant in 13-5150. David Pritchard, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee in 13-5150. James A. Simmons, Hendersonville, Tennessee, for Appellant in 13-5685. Marty Brett McAfee, MCAFEE & MCAFEE, Memphis, Tennessee for Appellant in 13-5907. David Lieberman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., David Pritchard, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee in 13-5685 and 13-5907. **ON BRIEF:** Michael J. Stengel, Memphis, Tennessee, Appellant in 13-5150. David Pritchard, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee in 13-5150. James A. Simmons, Hendersonville, Tennessee, for Appellant in 13-5685. Marty Brett McAfee, MCAFEE & MCAFEE, Memphis, Tennessee for Appellant in 13-5907. David

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1

Lieberman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C. for Appellee in 13-5685 and 13-5907.

––––––––––––––––

**OPINION**

––––––––––––––––

MARBLEY, District Judge.    Defendant-Appellant Demetrius Fields appeals his conviction and sentence following his guilty plea to racketeering conspiracy, conspiracy to distribute cocaine, and conspiracy to commit money laundering.  Defendants-Appellants Clinton and Martin Lewis appeal their sentences of life imprisonment following their convictions on multiple counts of racketeering conspiracy, drug conspiracy, money laundering conspiracy, and conspiracy to commit murder for hire, after a twenty-eight day trial in February and March 2012.

We hold that the United States did not breach its plea agreement with Fields and that the Lewis's seven-week trial was not marred by reversible error.  Accordingly, the district court's judgments in these cases are hereby AFFIRMED.

**I. BACKGROUND**

This case involves one of the largest drug-trafficking and violent-crime organizations in the southeastern United States.  Beginning in the mid-1990s, an individual named Craig Petties conducted a drug trafficking organization ("DTO") in and around Memphis, Tennessee, receiving shipments of marijuana and cocaine from contacts with Mexican drug cartels, smuggled to Tennessee on trucks and in delivery crates, to be distributed throughout the region. (R. 1422, Tr. 2/13/2012, PageID 75014-15, 7525-27; R. 1422-1, Tr. 2/14/2012, PageID 7583-85).  Petties' associates would receive the deliveries at gas stations outside Memphis, transfer the drugs into various vehicles, and spirit them away to stash houses for repackaging, distribution, and sale.  (R. 1422, Tr. 2/13/2012, PageID 7514-16; R. 1422-1, Tr. 2/14/2012, PageID 7587).

Law enforcement first noticed this DTO in 2001, when police discovered 650 pounds of marijuana during the raid of a home near Memphis.  (R. 1422, Tr. 2/13/2012, PageID 7429-43, 7518-19).  When law enforcement began targeting members of the DTO, Petties, fearing arrest, fled to Mexico, where he controlled his organization remotely, directing shipments, contacting

his lieutenants, and expanding his network.  (R. 1422-1, Tr. 2/14/2012, 7644-45, 7669).  His organization eventually spread to reach as far as Alabama, Mississippi, Georgia, Texas, North Carolina, Arkansas, and Missouri.  (R. 1422-4, Tr. 2/17/2012, PageID 8432; R. 1424, Tr. 2/21/2012, PageID 8950, 9816-19; R. 1425, Tr. 2/27/2012, PageID 9856).  Semi-trucks continued to arrive, carrying up to 500 kilograms of cocaine, to be distributed for millions of dollars in profit.  (R. 1424, Tr. 2/21/2012, PageID 8955-62).  Petties also employed violence, including multiple murders, to ensure the safety and success of his organization.  (R. 1422-2, Tr. 2/15/2012, PageID 7812; R. 1424-2, Tr. 2/23/2012, PageID 9599, 9608-10; R. 1422-4, Tr. 2/17/2012, PageID 8451-52).  Ultimately, Mexican authorities arrested Petties in 2008.

On June 26, 2008, Fields, Clinton, and Martin Lewis were named in the Sixth Superseding Indictment.  (R. 356, PageID 1153).  Clinton Lewis was charged with racketeering conspiracy (Count 1), violent crime in aid of racketeering conspiracy (Counts 2–4), conspiracy to commit murder for hire (Count 11), conspiracy to distribute cocaine (Count 14), conspiracy to commit money laundering (Count 18), and criminal forfeiture (Count 25).  (*Id.*).  Martin Lewis was named in Counts 2 and 11, as well as Count 24 (money laundering).  (*Id.* at PageID 1178, 1188, 1206).  Fields was charged with racketeering conspiracy, violent crime in aid thereof, conspiracy to commit murder for hire, conspiracy to possess with intent to distribute, and to distribute, cocaine, and conspiracy to commit money laundering.  (*Id.* at PageID 1153-1215).

### *A.  Fields*

On October 19, 2011, Fields pleaded guilty to Counts 1, 14, and 18 of the Sixth Superseding Indictment, charging him with racketeering conspiracy, drug conspiracy, and money laundering conspiracy.  (R. 1125, Plea Agreement, PageID 3023-30; R. 1508, Tr. 10/19/11, PageID 12721-821).  Sentencing was held on January 31 and February 1, 2013.  (R. 1506, Tr. 1/31/13, PageID 12584-685; R. 1506-1, Tr. 2/1/13, PageID 12685-719).  In relevant part, the Plea Agreement states, in Paragraph nine:

> [t]he United States anticipates, but does not commit to, filing motions for a downward departure pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). The filing of either motion is not part of this plea agreement. Mr. Fields understands that the government's determination of whether he has provided substantial assistance as contemplated by U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), and the

government's assessment of the value, truthfulness and completeness of any assistance Mr. Fields offers is solely within the judgment of the government and that its decision on whether to file either or both motions shall be binding upon the defendant. Pursuant to Fed. R. Crim. P. 11(c)(1)(B), if, in the exercise of its discretion, the government does file a motion for a downward departure pursuant to either or both U.S.S.G. § 5K1.1 and or 18 U.S.C. § 3553(e), it will recommend that Mr. Fields be sentenced to a term of imprisonment not to exceed twenty years. In this regard, it is understood by the parties if a motion for downward departure is made and granted, there will be no mandatory minimum sentences which apply to the defendant. The defendant will be free to argue for any sentence; and the United States may recommend a sentence of less than twenty years, depending on the nature and extent of Fields' truthful cooperation.

(R. 1125, Plea Agreement, PageID 3026). Furthermore, Paragraph fourteen provides:

Should it be judged by the government that the defendant has committed or attempted to commit any additional crimes or has engaged in any conduct constituting obstructing or impeding justice within the meaning of U.S.S.G. § 3C1.1, . . . the government will be released from its obligations under the agreement and would be free to argue for any sentence within the applicable statutory limits. Such a breach by Mr. Fields would not be grounds for him to withdraw his guilty plea.

(*Id.*, PageID 3028-29).

After pleading guilty, Fields cooperated with the United States in its prosecution of his co-conspirators, culminating in two days of testimony against Clinton and Martin. (R. 1506, Tr. 1/31/13, PageID 12655-63, 12672). As a result, the United States stipulated that Fields provided substantial assistance. (R. 1506, Tr. 1/31/13, PageID 12655-63, 12672).

Nevertheless, the United States did not move for a downward departure at Fields' sentencing because Fields was involved in a cocaine deal with an individual named Tamara Richardson, while he was detained at CCA Mason after his guilty plea and testimony. (R. 1506, Tr. 1/31/13, PageID 12649-50, 12672-73, 12675-77). In support of its contention, the United States offered the testimony of Sgt. Tony Parks, who reported that Richardson was arrested on March 31, 2012, with over a kilogram of cocaine inside of her girdle, as well as a cell phone, the records of which included a phone number matching a phone found in Fields' prison cell. (R. 1506, Tr. 1/31/13, PageID 12630-42). The United States also introduced a statement obtained from Richardson, which explained that Richardson collected the cocaine from Texas

and transported it by bus to Tennessee, where individuals working for "Meat," that is, Demetrius Fields, received it. (R. 1493, United States Sentencing Memo, PageID \_\_\_\_). Richardson herself did not testify at Fields' sentencing. (R. 1506, Tr. 1/31/13, PageID 12630-42).

> After hearing Sgt. Parks' testimony, the district court found that:

> [a]s far as the Government's decision, I've looked at these exhibits and I have to say that it seems to me — I've already said the Government doesn't have the obligation to establish that the agreement was breached but it has met its burden by a preponderance of the evidence and it can reasonably — its position is reasonable. I mean, it's absolutely reasonable that the Government, looking at these documents, going over these documents, hearing from Detective Parks, hearing a proffer from Ms. Richardson, would conclude that a 5K1 motion is inappropriate in this case. So, whether one wants to say as a matter of law or a matter of preponderance of the evidence proof, I think the Government's fully justified in not making a 5K1 motion.

(*Id.* at PageID 12653-54). The court further noted that while a motion under 5K1.1 would allow the court to sentence below the statutory minimum of ten years, this consideration was "irrelevant," since such a low sentence was "really not on the table." (*Id.* at PageID 12653).

At the sentencing hearing, the district court found that Fields had a total offense level of 43 and a criminal history category of VI under the Sentencing Guidelines, resulting in a Guidelines imprisonment range of life. (R. 1506, Tr. 1/31/13, PageID 12605-07). The district court reviewed Fields' substantial criminal history, as well as his family life, his age, and his education. The court concluded that Fields had provided substantial assistance, describing it as "extraordinary." (R. 1506-1, Tr. 2/1/13, PageID 12703-09). The United States concurred with this characterization. (*Id.*). The court heard arguments from Fields' counsel, and solicited a sentencing recommendation from the United States, which it declined to provide. (*Id.* at PageID 12689). The district court assessed the sentencing factors under 18 U.S.C. § 3553, and described the offenses to which Fields pleaded guilty as the most serious possible, given the quantity of drugs distributed, and the "many violent acts" involved. (R. 1506-1, Tr. 2/1/13, PageID 12693-96). The court found that Fields was responsible for the death of Mario Stewart, as well as the kidnapping and murder of Marcus Turner. (*Id.* at PageID 1295-96). The court also found that Fields was "involved in" the murder of Mario McNeil and the solicitation to murder Vacha Vaughn, Craig Jones, and Marcus Howell. (*Id.*). The court further reasoned that there was a

strong need to promote respect for the law in this case, as well as general deterrence, and protection of the public. (*Id.* at PageID 12702-03). The court purposefully excluded consideration of Fields' continued criminal conduct from its analysis, however, as it could not be satisfied without hearing live testimony from Richardson regarding the allegations against Fields. (R. 1506, Tr. 1/31/13, PageID 12649-51).

The court concluded that, absent Fields' cooperation, "[t]his [wa]s a case for life in prison." (R. 1506-1, Tr. 2/1/13, PageID 12703). The court specifically considered U.S.S.G. § 2A1.1, comment n.2(A), which it read to imply that "[t]he guidelines strongly suggest that life [imprisonment] is appropriate in a case like this . . . and a downward departure is discouraged." (*Id.* at PageID 12704-11). The court nevertheless concluded that a variance was warranted, due to Fields' "extraordinary" cooperation and assistance. (*Id.* at PageID 12704-09). Even so, the court found that a substantial sentence was necessary, as Fields was "one of the most culpable members of the conspiracy." (*Id.* at PageID 12713). The court ultimately varied downward from the Guidelines range and imposed a sentence of 444 months. (*Id.* at PageID 12714-15).

### B.  Clinton & Martin Lewis

Clinton and Martin Lewis pleaded not guilty and proceeded to a joint trial, which began February 6, 2012, and concluded March 23, 2012. Seventy-five witnesses testified and 315 exhibits were presented. Clinton Lewis was found not guilty as to Count 3, and guilty as to Counts 1, 2, 4, 11, 14, and 18. The jury also found the amount of cocaine involved to be in excess of 5 kilograms. (R. 1539, PageID 12977). Martin Lewis was found guilty on all counts.

On May 14, 2013, Clinton Lewis was sentenced to life imprisonment as to Counts 1, 2, 4, 11, and 14, and twenty years' imprisonment as to Counts 18, to be served concurrently. (R. 1539, Judgment, PageID 12977). The court also ordered restitution in the amount of $25,000. (*Id.*). Martin Lewis was sentenced to life imprisonment as to Counts 1, 2, and 11, and sixty months as to Count 24, to be served concurrently. (R. 1580, Sentencing Tr., PageID 13160-61).

According to trial testimony, Clinton knew Petties as early as the mid-1990s. (R. 1422, Tr. 2/13/2012, PageID 7505-06; R. 1422-1, Tr. 2/14/2012, PageID 7611). Starting in 2002,

Clinton became increasingly involved in Petties' organization, counting money, purchasing stash houses, and arranging deliveries.  (R. 1422-1, Tr. 2/14/2012, PageID 7667-68; R. 1422-3, Tr. 2/16/2012, PageID 8142-8146; R. 1424-1, Tr. 2/22/2012, PageID 9150-51, 9162).  He traveled to Mexico to meet with Petties (R. 1422-1, Tr. 2/14/2012, PageID 7659), and was one of those trusted with a cell phone capable of reaching Petties.  (R. 1425, Tr. 2/27/2012, PageID 9875).

Martin Lewis provided security for the organization.  (R. 1422-1, Tr. 2/14/2012, PageID 7690; R. 1425-1, Tr. 2/28/2012, PageID 9970).  Martin was tasked with protecting Petties' mother (R. 1427-1, Tr. 3/6/12, PageID 11258, 11261), and had several violent interactions with police (R. 1424, Tr. 2/21/2012, PageID 9036-41; R. 1427-1, Tr. 3/6/12, PageID 11364-68).

Testimony also implicated Defendants, in particular, in the murders of Marcus Turner and Mario McNeal.  In 2005, while searching for a member of Petties' organization who had stolen a shipment of cocaine and fled to Arkansas, Clinton, together with Marcus Brandon, kidnapped Marcus Turner, believing him to have information about the fugitive.  (R. 1424-2, Tr. 2/23/2012, PageID 9439-50, 9626-29).  After beating and interrogating Turner, they delivered him to three other members of the organization — Carlos Whitelow, Clarence Broady, and Demetrius Fields.  (*Id.* at PageID 9629-30).  When it became clear that Turner did not have the information, Petties ordered the men to hand Turner over to Clinton, Brandon, and Terry Peete. (*Id.* at PageID 9634-3).  Turner's body was soon thereafter discovered alongside a highway in Mississippi.  (R. 1425-3, Tr. 3/1/2012, at PageID 10483).

In 2007, in partial response to the killing of Turner, Mario McNeal threatened Petties' mother, for which Petties ordered McNeal's murder.  (R. 1424-1, Tr. 2/22/2012, PageID 9201, 9966).  After Whitelow spotted McNeal at a restaurant on March 16, 2007, and informed Fields, Clinton called Whitelow to tell him that "people [are] on the way," and Martin called to ask what McNeal was wearing.  (R.1425-3, Tr. 3/1/2012, PageID 10616-17).  Peete observed Martin enter the restaurant with a hat and a small revolver.  (R. 1427-1, Tr. 3/6/2012, 11286-89).  Peete heard gunshots, after which Martin ran back to the car still carrying the revolver.  (*Id.*).  A restaurant patron saw Martin enter the restaurant immediately before the shooting.  (*Id.* at PageID 11202-210).  McNeal died from multiple gunshot wounds.  (R. 1428, Tr. 3/7/2012, PageID 11465). Shortly thereafter, Martin was seen driving a new truck and wearing new clothes, and heard to

make various incriminatory statements about McNeal's death.  (*See, e.g.*, R. 1425-1, Tr. 2/28/2012, PageID 9968; R. 1425-2, Tr. 2/29/2012, PageID 10387-88; R. 1425-3, Tr. 3/1/2012, PageID 10618; R. 1428, Tr. 3/7/2012, PageID 11472).

Police arrested Clinton and Martin in 2007.  They were charged with various conspiracy and racketeering crimes, including the murder of Mario McNeal, the kidnapping and murder of Marcus Turner, cocaine distribution, and money laundering.  (R. 356, Sixth Superseding Indictment, PageID 1153).  At trial, the United States called over 70 witnesses, including Whitelow, Fields, Brandon, Peete, and Broady.  Clinton called, among others, TeMarcus Cartwright, who testified that he bought a .45-caliber handgun from Brandon, which matched a shell casing found near Turner's body and a bullet found inside Turner. (R. 1363, Tr. 3/14/2012, PageID 5018-24).  Martin called Vacha Vaughn, who testified that he witnessed Turner's kidnapping, and that Clinton was present. (R. 1364, Tr. 3/14/2012, PageID 5165).

After one day of deliberation, the jury acquitted Clinton of Count 3 (murder of Turner in aid of racketeering), but convicted him, and Martin, on all other counts, finding 27 different predicate acts in support of the RICO conspiracy charges in Count 1.  (R. 1371, Tr. 3/23/2012, PageID 5786-5787).  After the verdict, Clinton and Martin both requested judgments of acquittal based on insufficient evidence, the government's presentation of allegedly perjured testimony, and prejudice from a joint trial. (R. 1342, Mot. for J. of Acquittal, PageID 4372; R. 1343, Mot. for J. of Acquittal, PageID 4383).  The district court denied these motions (R. 1536, Order, PageID 12989), and sentenced both Defendants to life in prison.  (R. 1538; R. 1550). Defendants appeal the judgments against them.  The district court had jurisdiction pursuant to 18 U.S.C. § 3231, as Defendants were indicted by a federal grand jury for offenses against the laws of the United States.  We have jurisdiction to consider the appeals pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

### *A. Fields*

#### *1. Breach of the plea agreement*

Plea agreements "are contractual in nature. In interpreting and enforcing them, we are to use traditional principles of contract law." *United States v. Robison*, 924 F.2d 612, 613 (6th Cir. 1991). Questions regarding the content of the plea agreement are questions of fact, which this court reviews for clear error. *United States v. Wells*, 211 F.3d 988, 995 (6th Cir. 2000). Whether the government's conduct violated the agreement is a question of law, to be reviewed *de novo*. *Id.* In general, the trial court should hold the government to "a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities in . . . plea agreements." *United States v. Johnson*, 979 F.2d 396, 399 (6th Cir. 1992) (citation and quotation omitted).

In determining whether a plea agreement has been broken, the court "should look to what the defendant reasonably understood" when he entered into the agreement. *United States v. Herrera*, 928 F.2d 769, 771 (6th Cir. 1991). The "most persuasive evidence" of what a defendant "reasonably appreciated as his bargain is found in the plain language of the court-approved agreement." *United States v. Phibbs*, 999 F.2d 1053, 1081 (6th Cir. 1993).

In this case, Paragraph Nine of the plea agreement explains, and the district court understood the agreement to mean, that the United States "d[id] not commit to" filing a motion for a downward departure, and that the filing of such a motion "is not part of this plea agreement." (R. 1125, Plea Agreement, PageID 3026; R. 1506, Tr. 1/31/13, PageID 12610-18, 12653-54) (the United States "never made a contractual agreement to file a [substantial assistance] motion"; "I've already said that the Government doesn't have the obligation to establish that the agreement was breached."). In this circuit, when plea agreements "afford the government 'complete discretion' to file a motion for a downward departure, we limit our review to unconstitutional motives." *United States v. Villareal*, 491 F.3d 605, 608 (6th Cir. 2007). Indeed, unlike other circuits, "we do not review for bad faith when the decision to file a motion vests within the sole discretion of the government." *Id.* (citing *United States v. Hawkins*, 274 F.3d 420, 428 (6th Cir. 2001)). This court has consistently reaffirmed the validity of this

principle. *See, e.g.*, *United States v. White*, No. 12-4178, 2014 WL 289436, at *4 (6th Cir. Jan. 28, 2014) ("Because the Government reserved complete discretion in the written plea agreement . . . this court may only review the government's decision not to move for a substantial-assistance downward departure for unconstitutional motives."); *see also United States v. Howard*, 259 F. App'x 761, 762 (6th Cir. 2008); *United States v. Martin*, 318 F. App'x 313, 315 (6th Cir. 2008).

Fields does not allege any unconstitutional motive by the United States in declining to move for a downward departure. Furthermore, the plea agreement made clear that not only was it within the United States' sole discretion to determine whether Fields provided substantial assistance, but also within its judgment to assess the "value, truthfulness and completeness of any assistance [] Fields offer[ed]," as well as whether Fields "committed or attempted to commit any additional crimes." (R. 1125, Plea Agreement, PageID 3026, 2028). Thus, this plea agreement is unlike that found in *United States v. Lukse*, 286 F.3d 906 (6th Cir. 2002), or *Villareal*, 491 F.3d 605, where the agreement provided that "[i]f, in the sole discretion of the United States, the Defendant provides substantial assistance in the investigation or prosecution of another person who has committed an offense, the United States *will* make a motion for downward departure pursuant to U.S.S.G. § 5K1.1 of the Sentencing Guidelines or 18 U.S.C. § 3553(e), or both." *Lukse*, 286 F.3d at 908-09 (emphasis supplied). Accordingly, the *Lukse* court concluded that "[o]nce substantial assistance was acknowledged . . . the government was required to file the motion [for downward departure]." *Id.* at 912; *see also Villareal*, 491 F.3d at 610. Because the plea agreement here did not obligate the United States to file a motion, its admission on the record that Fields provided "extraordinary" assistance is unavailing.

Given the law of this circuit, it is difficult to conceive of how this agreement could have been clearer. Accordingly, we reject this ground for appeal.

### 2. Reasonableness of Fields' sentence

Post-*United States v. Booker*, 543 U.S. 220 (2005), we review a district court's sentencing determination "'under a deferential abuse-of-discretion standard,' for reasonableness." *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). The Supreme Court has "directed the Courts of Appeals to 'first ensure that the district court committed no significant procedural error'"; assuming that

the sentencing decision is procedurally sound, "'the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *United States v. Klups*, 514 F.3d 532, 536 (6th Cir. 2008) (quoting *Gall*, 552 U.S. at 51).

Fields challenges only the substantive reasonableness of his sentence. The essence of substantive reasonableness is "whether the length of the sentence is 'greater than necessary' to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan-Madrigal*, 601 F.3d 629, 632-33 (6th Cir. 2010). A sentence "may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008). "Because '[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a),' this [c]ourt applies a great deal of deference to a district court's determination that a particular sentence is appropriate." *United States v. Mayberry*, 540 F.3d 506, 519 (6th Cir. 2008) (quoting *Gall*, 552 U.S. at 51). Moreover, we "afford a within-guidelines sentence a rebuttable presumption of substantive reasonableness." *United States v. Taylor*, No. 13-5468, 2014 WL 783007, at *1 (6th Cir. Feb. 27, 2014) (per curiam). Accordingly, a defendant's "burden of demonstrating that his below-guidelines sentence 'is unreasonably long is even more demanding.'" *Id.* (quoting *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008)); *see also United States v. Greco*, 734 F.3d 441, 450 (6th Cir. 2013) ("Although it is not impossible to succeed on a substantive-reasonableness challenge to a below-guidelines sentence, defendants who seek to do so bear a heavy burden.").

Fields claims the district court considered "two impermissible factors," causing it to "g[i]ve undue weight to the advisory guideline range." (Doc. 16, Appellant's Br., at 33). He first asserts that the court erred by considering U.S.S.G. § 2A1.1, comment n.2(A), which states that, for offenses involving premeditated killings:

> life imprisonment is the appropriate sentence if a sentence of death is not imposed. A downward departure would not be appropriate in such a case. A downward departure from a mandatory statutory term of life imprisonment is permissible only in cases in which the government files a motion for a downward departure for the defendant's substantial assistance.

At Fields' sentencing, the district court, citing comment 2(A), observed that "[t]he guidelines strongly suggest that life [imprisonment] is appropriate in a case like this . . . and a downward departure is discouraged."  (R. 1506-1, Tr. 2/1/13, PageID 12704).  The court nevertheless concluded that, "under these circumstances, I have the authority . . . to vary . . . [since the court must] consider the person before me, the history and characteristics of the defendant, which is broad enough to include cooperation."  (*Id.*).

Fields notes that he was not subject to a mandatory minimum of life imprisonment, as referenced in the third sentence of the comment; rather, he faced a statutory minimum of 10 years' imprisonment, with an advisory Guidelines range of life.  (Doc. 16, Appellant's Br., at 33).  Thus, Fields objects to the invocation of § 2A1.1 comment 2(A), and insists that the court's "stated reliance" upon the comment, when Fields had in fact provided "extraordinary" assistance, "resulted in the recommended guideline range of life imprisonment receiving unreasonable weight in the sentencing calculus," and was thus "partially responsible for the imposition of a substantively unreasonable sentence."  (*Id.*).  Fields also argues that his sentence was the fault of the court's "focus[] on and consider[ation]" of the failure of the United States to make a specific sentence recommendation.  (*Id.*).  The court's two solicitations of such a recommendation, Fields maintains, evince its "consider[ation] [of] an inappropriate factor."  (*Id.* at 35).

The district court did not abuse its discretion in imposing its below-Guidelines sentence. The court extensively considered the § 3553(a) factors, including the nature of the offenses (R. 1506-1, Tr. 2/1/13, PageID 12693-96), Defendants' history and characteristics (*id.* at PageID 12699), the need to promote respect for the law and adequate deterrence (*id.* at PageID 12702), and the need to protect the public (*id.* at PageID 12702-03).  The court further considered Fields' cooperation and his "significant and useful" assistance (*id.* at PageID 12704-09), as well as the fact that he was "one of the most culpable members of the conspiracy" (*id.* at PageID 12713).

Nor can this court conclude that the district court abused its discretion in noting that, for other crimes involving premeditated killings, the Guidelines "strongly suggest that life [imprisonment] is appropriate" (*id.* at PageID 12704), especially in light of the fact that the court made clear that it was not bound by the Guidelines in crafting the appropriate sentence, and that it must be guided instead by the § 3553(a) factors (*id.*).  Fields has offered no evidence to show

that the district court gave impermissible weight to the Guidelines range — indeed, the district court varied from the recommended sentence of life imprisonment in order to take into account Defendant's substantial assistance, even absent a motion from the United States. And Fields has offered no evidence to suggest that the district court gave any weight whatsoever to the fact that the United States declined to offer a sentencing recommendation. No precedent prevents the district court from so inquiring, and nothing in the record provides any support to the notion that the district court improperly relied on the United States' refusal to give one.

It is not the province of this court "to decide afresh whether [Defendant's] circumstances warrant a larger variance or whether the sentence is reasonable." *United States v. Phinazee*, 515 F.3d 511, 521 (6th Cir. 2008) (citing *Gall*, 552 U.S. at 59). Rather, this court will reverse a sentence only if we can conclude that, taking into account "the totality of the circumstances," the sentence imposed was "greater than necessary" to achieve the goals of § 3553(a). *Tristan-Madrigal*, 601 F.3d at 633. That cannot be said here.

### B. Clinton & Martin Lewis

#### 1. Defendants' Motions to Sever

Normally, this court reviews a district court's ruling denying severance for abuse of discretion. *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005). Here, however, the parties agree that because Defendants failed to renew their motions at the close of evidence, our review is restricted to plain error. *See United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002). Under this analysis, Appellants must show: (1) error; (2) that was plain; (3) that affected a substantial right and that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Martin*, 520 F.3d 656, 658 (6th Cir. 2008).

There is a general preference for joint trial of defendants who are indicted together under Fed. R. Crim. P. 8(b). *Walls*, 293 F.3d at 966 (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). Even when joinder is proper, however, a court may "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires," if a joint trial "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). Severance is only required if there is "a serious risk that a joint trial would compromise a specific trial right of one

of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. But it is "well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540.

Clinton argues that his joint trial with Martin prejudiced him, by allowing several witnesses to testify and implicate Clinton, who would not have testified in a separate trial. In particular, Clinton faults the district court for allowing the testimony of Vaughn, called on behalf of Martin after Clinton and the United States had rested, who testified that Clinton, together with Brandon, was responsible for the abduction of Turner (R. 1364, Tr. 3/14/2012, PageID 5147, 5165). Clinton also argues that, during his cross-examination of Whitelow, a witness for the United States, Clinton carefully limited his questions to avoid the Turner kidnapping; nevertheless Martin elicited information from Whitelow implicating Clinton, which the United States further expanded upon during its re-direct. (R. 1425-4, Tr. 3/2/2012, PageID 10726-27). Martin argues that he was harmed by the joint trial as well, but offers scant specifics. Rather, he baldly insists that the United States' extensive testimony regarding the Turner kidnapping and the shooting of Billy Ray Myles "exceeded a mere spillover of evidence," thus making it "impossible for the jury to separate all of the testimony due to the number of witnesses and the confusing and often conflicting testimony." (Appellant's Br., Doc. 31 at 34-35).

Appellants have failed to demonstrate the requisite level of prejudice to merit a new trial. First, Clinton did not suffer prejudice under Rule 14 because the testimony challenged by him was independently admissible against him. *See Zafiro*, 506 U.S. at 539. Nor was the testimony so confusing that "a jury could [not] reasonably be expected to sort out the evidence." *United States v. Crotinger*, 928 F.2d 203, 206 (6th Cir. 1991). The "mere fact that each defendant 'points the finger' at his co-defendant" is insufficient. *Id.* "Hostility among defendants or the attempt of one defendant to save himself by inculpating another does not require that defendants be tried separately." *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992). Instead, the burden is on Defendants "to show that an antagonistic defense would present a conflict so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Id.* (citations omitted). Nor did Martin suffer prejudice: a defendant is not entitled to severance merely "because the proof is greater against a

co-defendant." *Id.* And a "spillover of evidence" from one case to another "generally does not require severance," unless Defendant can point to specific "substantial," "undue," or "compelling" prejudice. *United States v. Lopez*, 309 F.3d 966, 971 (6th Cir. 2002).

Moreover, even if the district court's ruling was in error, we cannot say that the error was one that affected a substantial right or seriously undermined the fairness, integrity, or public reputation of the proceedings. Although Whitelow and Vaughn implicated Clinton in the Turner kidnapping, at least three other witnesses testified to the same effect. (*See, e.g.*, R. 1424-1, Tr. 2/22/2012, PageID 9179, 9187-96; R. 1424-2, Tr. 2/23/2012, PageID 9624-37; R. 1425-2, Tr. 2/29/2012, PageID 10322-23). The district court also twice issued limiting instructions to the jury, cautioning them not to allow its decision as to one defendant or one count to influence its decisions as to the others. (*See* R. 1369, Tr. 3/22/2012, PageID 5591-92; R. 1370, Tr. 3/22/2012, PageID 5743-44)[1]; *compare Zafiro*, 506 U.S. at 539 ("less drastic measures [than separate trials], such as limiting instructions, often will suffice to cure any risk of prejudice.").

Defendants have failed to show "specific and compelling prejudice" that would "mislead and confuse the jury in the absence of a separate trial." *Walls*, 293 F.3d at 966. Even were any confusion present, it "must be balanced against society's interest in speedy and efficient trials." *Id.* at 967. We cannot conclude that Appellants have suffered a plain error.

### 2. Brady Violation

Defendants next argue that the district court should have granted a mistrial on account of alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963). We review denials of a motion for

---

[1]During the jury instructions, the court explained that "[t]he defendants have been charged with different crimes. I'm going to explain to you in more detail shortly which defendants have been charged with which crimes, but before I do I want to emphasize several things. This particular indictment has eight counts. The number of counts is not evidence of guilt, and should not influence your decision in any way. In our system of justice, guilt or innocence is personal and individual. It's your duty to decide separately the evidence against each defendant on each count and to return a separate verdict for each count. For each one, you decide whether . . . the government has presented proof beyond a reasonable doubt that a particular defendant is guilty of a particular charge. In other words, a particular defendant is guilty under a particular count. Your decision about one defendant on one count or one charge, whether guilty or not guilty, shouldn't influence your decision on the other defendant or any of the other charges." (R. 1369, Tr. 3/22/2012, PageID 5591-92).

The court also later reiterated the importance of considering Defendants separately: "But I will emphasize that you have to make a [sic] even though the acts are alleged to be the same, always consider the defendants separately, deliberate about each defendant separately. And just because you may find acts as to one defendant, doesn't mean that you can or should find acts against another defendant. You have to decide whether the government has proved beyond a reasonable doubt the particular acts." (R. 1370, Tr. 3/22/2012, PageID 5743-44).

a new trial based on *Brady* violations for abuse of discretion, but assess the existence of a *Brady* violation *de novo*. *United States v. Graham*, 484 F.3d 413, 416-17 (6th Cir. 2007).

Under *Brady*, the United States must disclose evidence "in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). To establish a violation of *Brady*'s rule, a defendant must show: "[1] the prosecutor suppressed evidence; [2] that such evidence was favorable to the defense; and [3] that the suppressed evidence was material." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). Evidence is material only if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Ritchie*, 480 U.S. at 57. Where the United States ultimately hands over the *Brady* material that could be used to impeach a witness, however, there is no violation "so long as the defendant is given [the] impeachment material, even exculpatory impeachment material, in time for use at trial." *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988); *see also United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2012) ("Thus, *Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose.") (quotation omitted).

Only where the defendant has been prejudiced by the delay in disclosure is *Brady* violated. *Davis*, 306 F.3d at 421. To establish prejudice, "a defendant must show what he would have done differently had he been given more time to address the *Brady* evidence, and specifically how, had the evidence been given to the defendant earlier, a reasonable probability exists that the result of the defendant's trial would have been different." *United States v. Spry*, 238 F. App'x 142, 148 (6th Cir. 2007) (citations omitted). The ultimate touchstone of this inquiry is, critically, "whether in [the] absence [of the evidence] [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). A "reasonable probability" of a different result is thus demonstrated when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 680 (1985) (opinion of Blackmun, J.)).

Clinton argues that the United States prejudiced him by its delayed disclosure of Cartwright's pre-trial statements. In June 2008, Cartwright informed police that he had received a .45-caliber handgun from Clinton, matching Brandon's statement to the same effect.

Cartwright, at the request of law enforcement, retrieved the weapon and deposited it in a park where it was collected by police. Ballistics testing matched the gun to a bullet in Turner's body and shell casing from the scene of the murder. This information was disclosed to the Defendants. In December 2011 and February 2012, however, Cartwright recanted, and insisted he had received the gun from Brandon, not Clinton. The United States delayed until March 2, 2012, the third week of trial — after Brandon and Detective Mark Jordan had already testified — to inform Defendants. (R. 1303, Order, PageID 4118-20). At a subsequent evidentiary hearing on the matter, Cartwright testified that Brandon sold him the weapon, and denied making the 2008 statement to the contrary. (R. 1361, Tr. 3/12/2012, PageID 4907-10). The district court denied the Defendants' motions for mistrial. (R. 1303, Order, PageID 4123).

Had he known about Cartwright's statements before trial, Clinton argues, he "would have utilized the information in preparing a defense theory that included drawing the jury's attention to an alternative suspect in the murder of Marcus Turner." (Appellant's Br., Doc. 42 at 33). Clinton also insists he was prejudiced because, without the material, he could not conduct a thorough cross-examination of Brandon, Peete, and Detective Jordan. (*Id.*). Martin insists that, although he was not charged with Turner's murder, the conflicting statements could have been used to prevent the jury from concluding that the murder was one of the predicate RICO acts. (Appellant's Reply Br., Doc. 39, at 6).

Martin further objects to the United States' presentation of the testimony of Broady, Brandon, Whitelow, Peete, and Fields, on the grounds that they "testified in conflicting manners regarding the kidnapping of Marcus Turner," as well as with regard to the murder of Mario McNeil (from Whitelow and Peete). (Appellant's Br., Doc. 31 at 14). Specifically, Martin argues that the United States "was aware these witnesses would testify conversely," but it nevertheless "placed [them] on the stand and elicited testimony in clear conflict one with another, and then provided these witnesses consideration [that is, 5k1.1 and/or Rule 35 motions for reduced sentences] for their testimony." (*Id.* at 11, 14).

Martin highlights the following inconsistencies, as summarized by the district court in its order denying Martin's motion for a mistrial:

- Broady:  testified that Clinton, Brandon, and Peete delivered Turner to Broady, after which he returned Turner to the same three men.

- Brandon:  testified that he witnessed Turner's abduction, but minimally participated in it, and never saw Turner again.

- Whitelow:  testified that he participated in the abduction of Turner, and claimed that he released Turner to Brandon and Peete.  Before trial, Whitelow claimed that Clinton killed Turner.

- Peete:  testified that he was not involved with the Turner kidnapping, and did not see Turner handed over to Clinton and Brandon.  In his pretrial statement, he claimed to have seen Turner after the kidnapping when he visited a home in east Memphis with Clinton; his pretrial statement is otherwise consistent.

- Fields:  testified that Turner was handed over to Clinton, Brandon, and Peete.

(R. 1315, Order, PageID 4147-51).

Martin also points to the testimony relating to the shootout involving Martin, Brandon, Dana Bradley, and Bobby Craft:  Craft testified that he was shot at repeatedly by Defendants and others; Brandon, that only Craft fired, and that Martin was not present; and Bradley, that Brandon's account was correct.  (*Id.*).

Martin insists that, had he known in advance about the inconsistencies in the testimony of these witnesses, and Cartwright's statements about where he obtained the gun, Martin "could have impeached Brandon and Peete" and, in general, could have "crafted a defense theory opening consistent with the evidence, cross-examinations supported by [Cartwright's new version of events], and other tactical decisions regarding how to attack the Government's case." (Appellant's Br., Doc. 31, at 18-19).  Martin specifically cites the fact that he could have drawn the jury's attention to an alternative suspect for Turner's murder, could have cast doubt on the chain of custody of the murder weapon introduced into evidence, and could have disputed his presence at the shootout with Bradley, Brandon, and Craft.  (*Id.* at 20-22).

The United States admits that it should have disclosed Cartwright's statements earlier, but insists that it did not "suppress" the information, and that the statements were not "material" to the verdict, and that Defendants were not prejudiced by the delay.  (Appellee's Br., Doc. 48, at 43).  In particular, the United States asserts that Clinton was able to call Cartwright during his

case-in-chief to elicit the statement that Brandon sold him the gun; and further that the United States acknowledged that Defendants were entitled to re-cross examine Brandon, though they ultimately declined to do so. The United States also argues that the delayed disclosure in no way affected the cross examination of Peete, since he was called after the disclosure, and he was unrelated to the sale of the gun. (*Id.* at 44).

With regard to Cartwright's testimony, Appellants have failed to show the requisite prejudice to warrant a new trial. Although they claim that, armed with Cartwright's second, inconsistent statement, they would have crafted a different defense strategy for trial, Appellants offer no further specifics. They were able to examine Cartwright regarding the statements, and were given the opportunity to re-cross Brandon and Detective Jordan (though they opted not to). Furthermore, the prejudice inquiry "does not extend to assessments of the impact that the suppression may have had on [Defendants'] subsequent trial strategy." *Smith v. Metrish*, 436 F. App'x 554, 564 (6th Cir. 2011 (citation omitted); *see also Joseph v. Coyle*, 469 F.3d 441, 473 n.23 (6th Cir. 2006) ("Rather, we have expressly recognized the Supreme Court's explicit rejection of the argument that 'the [materiality] standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial.'") (quotations omitted).

Nor did the delayed disclosure actually affect the outcome of the trial. Clinton was acquitted of Turner's murder, and Martin was not charged with it. The jury found 27 different predicate acts supporting the RICO conspiracy, of which Turner's murder could only have been one. (*See* R. 1371, Tr. 3/23/2012, PageID 5786-5787).

To be sure, *Brady*'s requirement that the suppressed evidence "actually affect the outcome" means more than merely "whether the defendant would more likely than not have received a different verdict with the evidence." *Kyles*, 514 U.S. at 434. Rather, we must inquire "whether in [the evidence's] absence, [Defendants] received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678).

The guarantees of *Brady* and its progeny serve the vital purpose of insuring that a conviction is consistent with the "rudimentary demands of justice," *Mooney v. Holohan*,

294 U.S. 103, 112 (1935), and we are cognizant of the risks of paying token respect to *Brady*'s mandate, while in practice allowing decisional rules to undercut *Brady*'s promise, granting the prosecution free reign to suppress evidence as long as the suppression falls just short of "prejudicial." *Compare* Carol S. Steiker, *Counter-Revolution in Constitutional Criminal Procedure? Two Audiences, Two Answers*, 94 MICH. L. REV. 2466 (1996) ("[W]hile there may be some police officers who will attempt to obey the law as they understand it, regardless of any sanction that may be imposed, there are no doubt other officers who will purposefully violate the law in the absence of sanctions, usually because they believe they can achieve law enforcement objectives by doing so.") (footnote omitted).

But Appellants have not shaken our faith in this trial's outcome. The United States presented substantial evidence of guilt, and Appellants struggle to explain with the required specificity *how* these statements, if disclosed earlier, would have changed any aspect of the trial. Although the United States committed a serious blunder that we do not easily countenance, we cannot conclude that the delayed disclosure here resulted in a trial unworthy of confidence.

With regard to the allegedly conflicting statements of the various witnesses, Martin has also failed to make his claim on appeal. When government witnesses present differing testimony, "[t]he burden is on the defendants to show that the testimony was actually perjured" — "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989); *see also United States v. Scarborough*, 43 F.3d 1021, 1026 (6th Cir. 1994). Although Martin submits that the Government was aware these witnesses would testify conversely, he offers no evidence to prove that this was the case. As explained below, Appellants have not demonstrated that the testimony in question was "indisputably false," that it was material, or that it was knowingly offered. (*See infra*, Part. IV.C.). Even assuming the United States withheld evidence, Martin still cannot explain how the United States "suppressed" the evidence, or how the delayed revelation would have changed any aspect of the trial.

### 3. Use of Allegedly Perjured Testimony

We review a district court's denial of a motion for a mistrial for abuse of discretion. *United States v. Atisha*, 804 F.2d 920, 926 (6th Cir. 1986).

The United States may not knowingly present false evidence. *Miller v. Pate*, 386 U.S. 1, (1967). A conviction obtained through the knowing use of perjured testimony must be set aside if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quotation omitted). To establish such a tainted result, Appellants must show that: (1) the statement was actually false; (2) the statement was material; and (3) the United States knew it to be false. *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986). The burden "is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by Government witnesses do not establish knowing use of false testimony." *Brooks v. Tennessee*, 626 F.3d 878, 895 (6th Cir. 2010) (quotation omitted).

Pointing to the conflicting statements regarding the Turner kidnapping described above (*see supra*, Part. III.B.2.), Clinton argues that the testimony of several witnesses — Broady, Brandon, and Fields — directly contradicts one another to such a degree that it "may not be reconciled" and thus "lead to the inescapable conclusion [that] one party has committed perjury during this proceeding." (Appellant's Br., Doc. 42, at 40). Martin's argument parallels Clinton's, but also faults the testimony of Brandon, Bradley, and Craft with regard to the alleged "shoot-out" (also described above, *see supra* Part. IV.B.). Martin further makes considerable hay of the fact that Bradley and Craft testified "in exchange for a benefit received and/or hoped for," that is, for reduced sentences in their own cases. (Appellant's Br., Doc. 31, at 26).

As described above, with regard to the Turner kidnapping, it is true that Broady and Brandon's testimony differed. Broady, whose testimony is much more specific, stated that Clinton, together with Brandon and Vaughn, kidnapped Turner, assaulted him, and drove him to Broady and Whitelow, who in turn drove Turner to East Memphis. (R. 1424-2, Tr. 2/23/2012, PageID 9629-31). Broady continued that, after this, Clinton, Brandon, and Peete picked up Turner, and he was never seen again. (*Id.* at PageID 9635; R. 1425, Tr. 2/27/2012, PageID 9763, 9791-93). According to Brandon, his own involvement was minimal, though he admits to

"slap[ing] Turner." (R. 1425-2, Tr. 2/29/2012, PageID 10322). Brandon also testified that he saw Clinton chase Turner, assault him, and drive off with him. (*Id.* at PageID 10323-24).

The district court, after observing the witnesses, found that the discrepancies in Broady and Brandon's testimony were due to lapses of memory or differences of perception:

> Broady's placement of Brandon in east Memphis after Turner's kidnapping could have been a mistake, a lapse of memory, or a difference in his perception of the events. That Broady, Brandon, and Whitelow implicated Peete in events after the kidnapping could be similarly affected. Whether a statement is indisputably false turns on facts, not conjecture.

(R. 1315, Order, PageID 4155). Finding no evidence probative of falsity, the district court concluded that these differences must be attributed to mere "inconsistencies." (*Id.*).

Appellants have provided no further proof on appeal to allow us to conclude that the district court abused its discretion in reaching this conclusion. And, even assuming that these statements were "indisputably false," they lack the requisite materiality to demand a mistrial. In substance, Broady and Brandon both testified to the same thing: Clinton kidnapped Turner, beat him up, and left with him, after which Turner was never again seen alive. Whitelow testified the same. (R. 1431, Tr. 3/5/2012, PageID 11807) ("Q. . . . [W]ho brought you Marcus Turner? A. Clinton Lewis . . . Q. What [did] Marcus Turner look[] like when Clinton Lewis brought him to you? A. Very bloody."). Fields and Vaughn also corroborated that Clinton was involved in the kidnapping of Turner. (*See* R. 1424-1, Tr. 2/22/2012, PageID 9386-90; R. 1364, Tr. 3/14/2012, PageID 5165). Appellants have failed to show how the inconsistencies among the testimony of these witnesses had any likelihood of affecting the judgment of the jury, much less the required "reasonable likelihood" that would call into question our confidence in the verdict.

Finally, Appellants have offered no evidence of the knowing presentation of false testimony. Appellants assert that the United States must have known about the inconsistencies, given its pre-trial interviews; but more is required. Some inconsistencies are bound to occur in any trial, especially one of this length, taking place this many years after the fact. As this court has observed, "[t]here would be no need for a jury if trials did not contain such inconsistencies." *Brooks*, 626 F.3d at 896. Inconsistent testimony does not *per se* demonstrate the knowing presentation of false evidence, and Appellants offer nothing beyond bare allegations. *Compare*

*Giglio*, 405 U.S. at 152. The witnesses here "had an agreement . . . in exchange for [their] testimony generally, not in exchange for a particular version of the facts," *Mitchell*, 443 F.3d 517, 536 (6th Cir. 2006). This is a permissible exchange, so long as the prosecution ensures that it does not knowingly allow false testimony, and corrects testimony known to be false. *See Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959). It did not fail that duty here.

Nor is there any merit to Appellants' additional allegations about inconsistencies in testimony related to the alleged "shoot out." Although Martin insists that Craft testified that he was shot at by Brandon and Bradley, in fact the testimony is consistent, as Brandon and Bradley testified that Craft shot at them and that they did not return fire (R. 1425, Tr. 2/27/2012, PageID 9904), and Craft confirmed that only he fired any shots during the chase (R. 1424-2, Tr. 2/23/2012, PageID 9455, 9476, 9503). Although Martin also raises the fact that testimony was in conflict over his presence during the chase, he fails to explain how this discrepancy was false, how it was material, or whether the United States knew beforehand.

### 4. Defendants' Trial Testimony Objections

Appellants next take issue with several evidentiary and trial-management decisions made by the district court, including: (a) the district court's refusal to allow the cross-examination of Billy Ray Myles regarding the charges pending against him; (b) the decision of the district court permitting the recall of Whitelow; and (c) the court's denial of Martin's right to call Kevin McKenzie as a witness, and consequently the right of Clinton to cross-examine him.

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Gibbs*, 182 F.3d 408 (6th Cir. 1999). In determining a trial court's limitation of cross-examination for motive, bias, or prejudice, a reviewing court must decide "whether the jury was otherwise in possession of sufficient information concerning formative events to make a discriminating appraisal of a witness' motives and bias." *Stevens v. Bordenkircher*, 746 F.2d 342, 346-47 (6th Cir. 1984) (quotation omitted). A court abuses its discretion when a party is not permitted "reasonable latitude" to develop facts tending to demonstrate that the testimony-in-chief is biased and "sufficient independent evidence of bias is not available to the jury." *Id.* at 347. If we conclude that the district court abused its discretion, we must take the further step of

assessing "whether the constitutional error is harmless beyond a reasonable doubt." *See Chapman v. California*, 386 U.S. 18 (1967).

Clinton asserts that it was error for the district court to limit his cross-examination of Billy Ray Myles. In particular, although Clinton was able to elicit testimony from Myles that he had previously lied in state court proceedings over twelve times (R. 1422-3, Tr. 2/16/2012, PageID 8023, 8058, 8082-85), and that he had prior convictions for theft, possession of a controlled substance, and burglary (*id.* at PageID 8062), Clinton maintains that he should have been allowed to question Myles regarding his then-pending charges for aggravated robbery. Martin adds that by limiting cross-examination, the court prevented the jury from hearing "evidence of extreme bias towards the Government," since, according to Martin, Myles could anticipate some benefit in connection with these charges after he testified against Defendants. Thus, Martin insists that evidence was admissible to impeach. (Appellant's Br., Doc. 31, at 40).

Myles was called as part of the United States' case-in-chief, where he testified, on direct-examination, that he had broken into Clinton's "stash house" and stolen drugs and a gun, after which Clinton and Brandon retaliated against him, shooting him in the leg and threatening worse. (R. 1422-2, Tr. 2/15/2012, PageID 8015-16). The district court prevented questioning regarding the charges, ruling that Appellants could not inquire "in any generalized way"; rather, the court would permit "appropriate questions" to "explore bias," but "unless [counsel] lay [a] foundation for it and there's a justification for it based on the record," general questioning about what Myles had been charged with was "unfairly prejudicial" under Fed. R. Evid. 403. (R. 1422-3, Tr. 2/16/2012, PageID 8045, 8047-51).

In light of the extensive testimony regarding Myles' potential bias, including his past convictions, past instances of perjury, and the fact that he was at that time facing charges in state court amounting to up to 96 years' imprisonment, this court is hard-pressed to conclude that the jury was not "otherwise in possession of sufficient information concerning formative events to make a discriminating appraisal of the witness' motives and bias." *Stevens*, 746 F.2d at 346-47. The district court permitted Defendants reasonable latitude in questioning Myles, and counsel for Martin was able to elicit from Myles testimony that he was, in fact, facing significant charges in state court. The court did not abuse its discretion preventing further confusion.

Clinton next challenges the recall of Whitelow. Under Fed. R. Evid. 611(a), trial courts have "substantial discretion" in managing their courtroom. *United States v. Maddox*, 944 F.2d 1223, 1230 (6th Cir. 1991). A trial court's ruling, then, "will not be the basis for reversal of a criminal conviction unless a defendant's substantial rights are affected." *United States v. Terry*, 729 F.2d 1063, 1067 (6th Cir. 1984). Under Rule 611(a), a court must exercise "reasonable control" over the mode and order of examining witnesses, so as to "make those procedures effective for determining the truth," to "avoid wasting time," and to "protect witnesses from harassment or undue embarrassment." The court must "consider the party's explanation for failing to introduce the evidence earlier, the admissibility of the evidence, its relevance, and the degree to which the opposing party would be prejudiced by reopening the case." *United States v. Wilson*, 27 F.3d 1126, 1129 (6th Cir. 1994)

The United States' direct-examination of Whitelow focused on the murder of Mario McNeal. During cross-examination, however, Martin asked Whitelow to testify regarding the Turner kidnapping. The United States thus sought to then re-open its examination, to pose new questions about the kidnapping. The district court allowed further questioning, reasoning that the government's proof had not yet closed, Whitelow was still on the stand, and no intervening event (other than cross-examination) had occurred. (R. 1431-1, Tr. 3/5/2012, PageID 11773). The court also noted that the evidence sought would have been admissible on direct-examination, and Defendants would have "an opportunity for a thorough cross." (*Id.* at PageID 11774-75). Upon re-direct, Whitelow testified that Clinton had helped kidnap Turner. (*Id.* at 11807).

Clinton faults the court for not inquiring into why the United States did not pursue its line of questioning on direct-examination, and further asserts that he suffered significant prejudice from the court's ruling, since Whitelow testified that Clinton was involved in the Turner kidnapping. The United States responds that it articulated a reasonable explanation for re-opening its direct-examination — namely, fear that the jury was left with an incomplete picture of the events of the Turner kidnapping after Martin's cross-examination of Whitelow.

The district court did not abuse its discretion. Its ruling considered the factors this court outlined in *Wilson*, including the United States' explanation for its lapse, the admissibility of the evidence, its relevance, and the degree of prejudice, 27 F.3d at 1129, and the court made sure to

grant Clinton the chance for a "thorough cross" of the witness afterward. (R. 1431-1, Tr. 3/5/2012, PageID 11774-75). Although Clinton's case was undoubtedly hurt by Whitelow's testimony against him, it does not follow that he suffered undue prejudice. *See United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985) ("Where, as in this case, reopening is permitted . . . before the defendant has presented any evidence, it is unlikely that prejudice sufficient to establish an abuse of discretion can be established.").

Finally, Appellants fault the district court for denying Martin the right to call Kevin McKenzie, and consequently the right of Clinton to cross-examine him. In reviewing a trial court's evidentiary determinations, "this court reviews *de novo* the court's conclusions of law and reviews for clear error the court's factual determinations that underpin its legal conclusions." *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003) (quotation omitted).

As part of his defense, Martin subpoenaed Kevin McKenzie, a former Mississippi police lieutenant who led a state investigation into Turner's murder. To accommodate McKenzie's schedule, the district court agreed to supervise a videotaped deposition, to be played to the jury. Martin's proffer explained that McKenzie would testify that he believed that Brandon murdered Turner, with Peete's assistance; that he had secured a warrant of arrest against Brandon for Turner's murder; and that Mississippi prosecutors terminated the case after reaching an agreement with the United States Attorney's Office. (R. 1427-1, Tr. 3/6/2012, PageID 11393-417). The district court excluded the testimony, on the grounds that it was substituting McKenzie's judgment for the jury's as to the ultimate question of who killed Turner; that the testimony would open the door to McKenzie's assessment of Clinton's culpability, an impermissible opinion; and that McKenzie's testimony about the state prosecutor's decision was inadmissible and confusing hearsay. (*Id.* at PageID 11399-421). The court would still have permitted McKenzie to testify about facts to which he had personal knowledge, such as the crime scene and chain of custody, but Martin chose to remain firm as to his proffer, causing the court to release McKenzie and not to conduct the deposition. (*Id.* at PageID 11405, 11430-31).

Clinton and Martin argue that Martin should have been permitted to call McKenzie, as his testimony would have helped impeach the government witnesses involved in the Turner kidnapping. Clinton also insists that McKenzie would have offered testimony to show that

various government witnesses received the "benefit" of not being prosecuted by state officials in Mississippi in exchange for their testimony here. (Appellant's Br., Doc. 42, at 60-61; Appellant's Br., Doc. 31, at 42-43).

The district court did not commit clear error. Martin's proffer demonstrated that he sought to elicit testimony from McKenzie that would go to the central issue of the credibility, and ultimate guilt, of Defendants and various witnesses, provinces reserved exclusively for the jury. *Cooper v. Sowders*, 837 F.2d 284, 287 (6th Cir. 1988) (finding error where "[a] police officer was permitted to testify to his own, personal opinion that such evidence as there was against other suspects was insufficient to justify their arrest," which served to "suggest[] to the jury the guilt of the accused and the innocence of other suspects."); *see also* Fed. R. Evid. 704, Advisory Committee Notes (noting that Rule 704 was designed to prevent "the admission of opinions which would merely tell the jury what result to reach"). Moreover, as the district court noted, much of McKenzie's proffered testimony consisted of "rank hearsay." (*See* R. 1427-1, Tr. 3/6/2012, PageID 11421). And we find no error in the district court's conclusion that the probative value of McKenzie's testimony would likely be far outweighed by the undue confusion and complication it would add, given that Martin was not charged with Turner's murder.

### 5. *Variance in the proof of conspiracy*

Appellants allege that a variance occurred because evidence presented at trial proved multiple conspiracies, while the indictment alleged only a single conspiracy. We review *de novo* whether a variance has occurred. *United States v. Smith*, 320 F.3d 647, 656 (6th Cir. 2003). A variance arises when the terms of the indictment "are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Chilingirian*, 280 F.3d 704, 711 (6th Cir. 2002) (quotations omitted). If an indictment charges one conspiracy, but the evidence "can reasonably be construed only as supporting a finding of multiple conspiracies, the resulting variance between the indictment and the proof is reversible error, if the appellant can show that he was prejudiced thereby." *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)). Thus, to obtain reversal, Appellants normally must demonstrate: (1) that a variance occurred; and (2) that it affected a substantial right. *United States v. Hughes*, 505 F.3d 578, 587 (6th Cir. 2007).

But when the issue is first raised on appeal, as here, we review for plain error, meaning that Appellants must prove that the error affected the outcome of the district court proceedings. *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008) (citations omitted).  We first look to whether the evidence "reasonably can be construed only as supporting a finding of multiple conspiracies," rather than a single conspiracy.  *Warner*, 690 F.2d at 548.  Whether single or multiple conspiracies have been proved is "usually a question of fact to be resolved by the jury . . . and [is] to be considered on appeal in the light most favorable to the government." *United States v. Schultz*, 855 F.2d 1217, 1222 (6th Cir. 1988) (internal quotation omitted).

Clinton argues that the United States attempted to prove a "chain conspiracy," which requires proof of a vertical, interdependent structure connecting the participants, from suppliers to middlemen to end consumers.  *See United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006). The United States failed, Clinton concludes, because the evidence at trial depicted only "different or disconnect [sic] groups of persons acting with different females at different times in different cities and states."  (Appellant's Br., Doc. 42, at 53).  Given the expansive nature of the conspiracy, Clinton adds, the United States improperly "piled inference upon inference."  Martin asserts that the United States actually proved only the existence of several smaller conspiracies, linked only by the involvement of Petties himself, and otherwise unconnected.

Examining whether there was "a common goal, the nature of the scheme, and the overlapping of participants in various dealings," *Smith*, 320 F.3d at 652, we cannot agree that the evidence, considered in the light most favorable to the United States, can be construed "*only* as supporting a finding of multiple conspiracies," *Warner*, 690 F.2d at 548 (emphasis added).  The United States presented significant evidence at trial establishing an ongoing enterprise, which expanded from a group of small-scale dealers in Memphis to an international drug trafficking organization.  Petties was its leader, and Defendants served in an advanced hierarchy.  (R. 1422-1, Tr. 2/14/2012, PageID 7565).  Each member had his role, including distribution of drugs, collection of proceeds, and protection.  Petties gave orders and others followed.  The enterprise had a defined structure and purpose.  (*See* R. 1422-1, Tr. 2/14/2012, PageID 7574).

Testimony at trial also supported Clinton and Martin's involvement.  A reasonable juror could conclude that Clinton distributed cocaine, operated a "stash house," and was an enforcer.

(*See, e.g.*, R. 1424-1, Tr. 2/22/2012, PageID 9150, 9162-66; R. 1422-3, Tr. 2/16/2012, PageID 8142).   Martin provided security for the organization.   (*See, e.g.*, R. 1422-2, Tr. 2/15/2012, PageID 7810-12; R. 1424-2, Tr. 2/23/2012, PageID 9604; R. 1427, Tr. 3/5/2012, PageID 10935; R. 1427-1, Tr. 3/6/2012, PageID 11258).     Multiple witnesses corroborated Appellants' association with the enterprise, and the acts they performed in furtherance of its objectives.  (*See, e.g.*, R. 1422-3, Tr. 2/16/2012, PageID 8142; R. 1427, Tr. 3/5/2012, PageID 10934-35; R. 1427-1, Tr. 3/6/2012, PageID 11288).   Connection with other gang members can be sufficient to establish an association, *United States v. Chance*, 306 F.3d 356, 386 (6th Cir. 2002), and killing someone who threatens the enterprise is more than enough to allow the inference that a defendant "acted with the intent of perpetuating [the organization] as a criminal enterprise and thereby furthering all of its racketeering activities." *United States v. Fowler*, 535 F.3d 408, 420 (6th Cir. 2008).   Furthermore, in such an expansive organization, a jury reasonably could "assume that participants underst[ood] that they [were] participating in a joint enterprise because success [was] dependent on the success of those from who they b[ought] and to whom they s[old]." *United States v. Henley*, 360 F.3d 509, 513 (6th Cir. 2004) (citations omitted).

Appellants' argument that the conspirators formed smaller groups to carry out their business is unavailing; the "mere fact that a conspiracy can be subdivided . . . does not mean that multiple conspiracies existed." *United States v. Wilson*, 168 F.3d 916, 924 (6th Cir. 1999). Moreover, a conspirator is liable "even if he did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy." *United States v. Martinez*, 430 F.3d 317, 333 (6th Cir. 2005).   And even if Appellants can demonstrate a variance, they cannot show that it affected the outcome of the trial.  *See Swafford*, 512 F.3d at 841.   The threat of prejudice from guilt transference can typically be cured "with a cautionary instruction to the jury." *Hughes*, 505 F.3d at 587.   And "spillover" concerns are absent here, as the jury separately found 27 distinct predicate acts underlying the RICO charge.

### 6. Cumulative error

Finally, Appellants demand reversal for cumulative error.   They "must show that the combined effect of individually harmless errors was so prejudicial as to render [the] trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004).   While it is

true that errors that "might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair," *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000) (quotation omitted), that is not the case here. We have found no error in the trial court's handling of this case, other than the United States's failure timely to produce *Brady* materials, a singular error which did not prejudice Appellants. Where "no individual ruling has been shown to be erroneous, there is no 'error' to consider, and the cumulative error doctrine does not warrant reversal." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012) *cert. denied*, 133 S. Ct. 1650 (U.S. 2013).

## III. CONCLUSION

Fields has failed to show that the district court erred in any of the three determinations appealed. Clinton and Martin Lewis have failed to demonstrate reversible error in any of the numerous grounds they have raised. The decisions of the district court are hereby AFFIRMED.