NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0210n.06

No. 17-1126

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Apr 24, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | On Appeal from the United States |
| v. | ) | District Court for the Eastern District |
| | ) | of Michigan |
| DAVON MERKIESE KEMP, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

_____/

**Before: COLE, Chief Judge; GUY and DONALD, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** Davon Kemp was convicted by a jury of one count of attempted possession with intent to distribute at least 500 grams of cocaine, and received a below-Guidelines sentence of 180 months of imprisonment. Kemp challenges the sufficiency of the evidence to support his conviction, and, in the alternative, seeks a new trial on three grounds: (1) that evidence seized pursuant to a warrant should have been suppressed; (2) that tardy disclosure of *Brady* material denied him a fair trial; and (3) that plain error resulted from an incorrect statement of fact by the prosecutor during closing argument. Kemp also claims that his sentence was procedurally unreasonable because the district court erred both in determining the quantity of drugs attributable to him and by imposing a four-level upward adjustment for his role in the offense. For the reasons that follow, Kemp's conviction and

sentence are affirmed.

## I.

The charges arose out of the discovery by an astute Texas State Trooper of five kilograms of cocaine concealed in the spare tire of a Chevy Silverado that was being transported by car hauler from Arizona to Michigan. That led to the controlled delivery in Michigan two days later—on June 27, 2015—of the Silverado in which the cocaine had been replaced with five kilograms of a sham substance containing a detectable amount of cocaine. Members of a DEA Task Force surveillance team observed the delivery of the Silverado in the parking lot of a Kroger store in Ferndale, Michigan. Then the surveillance team followed the Silverado as it traveled in tandem with a black Saab SUV and a black Nissan Pathfinder to southwest Detroit, stopping first at a gas station and then proceeding to a loft apartment building at 727 West Grand Boulevard in Detroit, Michigan.

Agents followed the Silverado and the Pathfinder into the gated parking lot of the apartment building, and arrested Travoughn Daniels, Kevin Samaniego, and Raynaldo Galindo in the rear parking area. Galindo was walking toward the building, Daniels had a handgun in his pocket, and Samaniego was lowering the spare tire from the undercarriage of the Silverado. Although the Saab did not follow the others into the gated parking lot, it drove past and was quickly stopped about six blocks away. The Saab's driver Myron Duncan-Plunkett and his passenger Devon Kemp were arrested. Plunkett was carrying several thousand dollars in cash, and Plunkett and Kemp each had a cell phone.

A warrant was obtained the same day to search 727 West Grand Boulevard, Apartment 312, which was the address listed on Daniels' identification and where Daniels said he resided. Evidence seized during the search included: a loaded SKS rifle found in a closet by the door,

crack cocaine from an upstairs bathroom, and heroin concealed in an iPhone box that was left in a laundry hamper. In one bedroom, agents found $35,000 in cash, a drug ledger, a lease for the loft in Plunkett's name, and identification belonging to Plunkett and Daniels. Agents also seized Arizona license plates and heat-sealed packaging materials from another bedroom. And, although Kemp lived in Arizona, his laptop computer was on the dining room table and his suitcase with his passport and other papers were found in the kitchen.[1]

An indictment was returned against Kemp, Daniels, Plunkett, Samaniego, and Galindo. All five defendants were charged with conspiracy to possess with intent to distribute and to distribute cocaine (Count I), and attempted possession with intent to distribute cocaine, aiding and abetting (Count II). Kemp, Daniels, and Plunkett were also charged with offenses related to the drugs and rifle found in the apartment (Counts III and IV). Lastly, Daniels was charged separately with two additional firearm offenses (Counts V and VI).

Samaniego and Galindo entered plea agreements and testified for the government at trial, explaining that they flew to Detroit to meet the Silverado and complete delivery of the cocaine at the request of a drug dealer named Hector Sanchez. Sanchez, a self-described drug dealer working with someone connected to a Mexican drug cartel, was arrested in Arizona almost a year later and decided to cooperate in this and other investigations. Sanchez testified at trial that he met Kemp, whom he also knew as "Ox" or "O," in late 2014, and discussed sending Kemp eight to twelve kilograms of cocaine to distribute in Detroit. According to Sanchez, he and his cartel contacts used car haulers to send to Detroit for Kemp: (1) ten kilograms of cocaine hidden in an Escalade in January 2015; (2) ten kilograms of cocaine concealed in a Denali in February 2015; and (3) the five kilograms of cocaine hidden in the spare tire of the Silverado that was

---

[1]The door to Apartment 312 opened into space that used to be three separate units—312, 314 and 316—but had been combined into one larger unit with three living quarters with no walls dividing them. The drugs were found in the upper loft of the portion that was unit 312, while Kemp's things were in the lower level of what was unit 316.

intercepted in June 2015. Sanchez testified that he flew with Kemp to Detroit to meet the first shipment, and they were picked up by Daniels and Plunkett. Sanchez said he flew with his brother to meet the second shipment, and they were picked up by Kemp and Plunkett. But, Sanchez explained that he asked Samaniego and Galindo to go in his place for the third shipment because his wife's uncle was ill. Daniels and Plunkett pleaded guilty during a break in the trial; but neither testified against Kemp. As a result, the jury deliberated only as to the charges against Kemp. Kemp was acquitted of Counts I, III, and IV, but was found guilty on Count II with the specific finding that Kemp had attempted to possess with intent to distribute at least 500 grams of cocaine on June 27, 2015.

At sentencing, the district court determined Kemp's applicable Guidelines range to be 235 to 292 months based on a total offense level of 36 and a criminal history category of III. Over defense counsel's objection to any reliance on acquitted conduct, the district court determined Kemp's base offense level to be 32 after finding that the offense involved at least 15 but less than 50 kilograms of cocaine. The district court also added a four-level upward adjustment for Kemp's role in the offense pursuant to United States Sentencing Guidelines Manual (USSG) § 3B1.1(a) ("organizer or leader of a criminal activity that involved five or more participants"). However, concluding that the Guidelines overstated Kemp's criminal history, the district court varied downward and sentenced Kemp to 180 months of imprisonment and a four-year term of supervised release. This appeal followed.[2]

## II.

The district court denied Kemp's motion for judgment of acquittal at the close of the proofs, and we review his challenge to the sufficiency of the evidence *de novo*. *United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010). The question for this court "is whether, after

---

[2]The district court rejected two other proposed increases in the offense level that are not at issue here.

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making this determination, "we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994).

To convict Kemp of attempted possession with intent to distribute cocaine, the government must prove that he (1) intended to commit the proscribed criminal conduct and (2) took "a substantial step towards commission of the proscribed criminal activity." *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999); *see also United States v. Israel*, 662 F. App'x 382, 385 (6th Cir. 2016). A "substantial step" may be taken for purposes of an attempt conviction though the defendant "failed to gain possession of drugs or 'sham' drugs." *Bilderbeck*, 163 F.3d at 975 (citing *United States v. Pennyman*, 889 F.2d 104, 107 (6th Cir. 1989)). But, to guard against conviction for "mere thoughts, desires, or motives, we require that the substantial step consist of objective acts that mark the defendant's conduct as criminal in nature." *Id.* (citing *Pennyman*, 889 F.2d at 107). "Put differently, 'the defendant's objective conduct, taken as a whole, must unequivocally corroborate the required subjective intent to purchase or sell actual narcotics.'" *Israel*, 662 F. App'x at 385 (quoting *United States v. Pennell*, 737 F.2d 521, 525 (6th Cir. 1984)).

Kemp argues that, as in *Sliwo*, evidence that he was a passenger in the Saab and acted as a lookout in the retrieval of the Silverado would be insufficient to prove he intended to possess with intent to distribute cocaine. *See United States v. Sliwo*, 620 F.3d 630, 636-38 (6th Cir. 2010). In *Sliwo*, evidence that the defendant acted as a lookout at several locations suggested he knowingly participated in a scheme with some criminal purpose. But, he was not seen where

drugs changes hands, was not in a vehicle that was transporting drugs, *and* there was no evidence of substantive discussions with the other participants that would allow an inference that he knew he was involved in a scheme to procure marijuana. *Id*. This case, however, is easily distinguished from *Sliwo* because there was evidence other than the surveillance team's observations from which a reasonable jury could conclude beyond a reasonable doubt that Kemp had intended to possess with intent to distribute cocaine.

The undisputed evidence established that five kilograms of cocaine was intercepted in transit from Arizona to Detroit on June 25, 2015, and then replaced with a substitute that was delivered to the intended recipients under the watchful eye of the DEA surveillance team on June 27, 2015. Sanchez testified that, although he did not load the cocaine into the Silverado himself, he was present when the Silverado left by car hauler and was told where the cocaine had been hidden after it was already en route. Samaniego and Galindo flew to Detroit to meet the Silverado and make the delivery, and Sanchez paid for their flights. Importantly, Samaniego's testimony confirmed that Sanchez gave him a cell phone and a phone number to use to contact "O" once he and Galindo arrived in Detroit.

Cell phone records showed that Samaniego used that phone to exchange text messages with "O" about being picked up at the airport in Detroit. Samaniego and Galindo were then picked up by Daniels and driven to the apartment on West Grand Boulevard. Samaniego and Galindo testified that when they arrived, Kemp was in the apartment working on his laptop computer at the dining table. According to Samaniego, Kemp shook his hand, introduced himself as "O," and asked whether the cocaine that was coming was "any good." Samaniego answered that it should be, and told Kemp that he would need cash to pay the car hauler when it

arrived. All five defendants stayed the night at the apartment, including Kemp, who slept on the couch.

The next day, Samaniego received a call from Sanchez who told him to tell "O" and the others that the car hauler had arrived. The defendants left the apartment at the same time: Kemp and Plunkett in the Saab; Daniels, Samaniego, and Galindo in the Pathfinder. When they got to the Kroger parking lot, Galindo was let out and the others circled while waiting for the car hauler. Once it arrived, Galindo approached on foot, paid the drivers in cash, and installed an Arizona license plate on the Silverado. Leaving there, Plunkett and Kemp led the way in the Saab, followed by Galindo in the Silverado, and lastly Daniels and Samaniego in the Pathfinder. The three vehicles were observed driving in tandem on and off the highway, until reaching a gas station in southwest Detroit.

Samaniego testified that Daniels was talking by cell phone with the Plunkett and Kemp in the Saab, and conveyed to them that Samaniego wanted to stop in order to check out the Silverado and because Samaniego thought a white Mercedes might be following them. The Saab drove past the gas station, and doubled back in a manner that suggested counter-surveillance. The Silverado and Pathfinder stopped at the gas station, where Samaniego fixed a tail light on the Silverado and looked for a GPS tracking device before the three vehicles proceeded to the apartment building on West Grand Boulevard.[3]

As noted at the outset, the Silverado and Pathfinder were followed into the gated parking lot and around to a rear parking area. Galindo testified that he took the keys to go into the apartment; Daniels was ordered onto the ground and a handgun fell out of his pocket; and Samaniego was lowering the spare tire of the Silverado and had a utility knife resting on the

---

[3]A GPS device had been installed pursuant to a warrant, but it was not discovered.

bumper. When the Saab was stopped a few blocks away, Kemp was carrying a cell phone that had the same number that Samaniego had used to contact "O" upon arriving in Detroit. Sanchez testified that he was expecting a call to confirm that the cocaine had been delivered, and when it did not come he tried unsuccessfully to call first Samaniego, then Kemp, and finally Galindo. Unable to reach any of them, Sanchez turned off his phone and took out the battery.

Viewing the evidence in the light most favorable to the prosecution, and being mindful that we may not independently weigh the evidence or judge the credibility of the witnesses, a reasonable juror could conclude that Kemp was expecting to receive delivery of five kilograms of cocaine, was involved as a lookout in retrieving the Silverado in which that cocaine was to be transported, and planned to take the cocaine into the apartment where he and his codefendants had spent the night before waiting for the delivery. We find that the evidence was sufficient to establish that Kemp intended to possess with intent to distribute cocaine on June 27, 2015, and took "substantial steps" toward commission of that offense.[4]

### III.

Kemp argues for a new trial on three grounds; none of which are availing.

#### A.        Motion to Suppress

Kemp appeals the denial of his motion to suppress evidence seized from the apartment, arguing that the search warrant affidavit failed to establish a "nexus" between the suspected criminal activity and the location to be searched. On appeal from the denial of a motion to suppress, this court reviews a district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Brown*, 732 F.3d 569, 572 (6th Cir. 2013). The district court's conclusion that the search warrant affidavit established probable cause to search is a legal

---

[4]It is not necessary to address the government's alternative theory that Kemp was also criminally liable as an aider and abettor, which would require proof that he took an affirmative act in furtherance of the offense "with the intent of facilitating the offense's commission." *Rosemond v. United States*, 134 S. Ct. 1240, 1245 (2014).

question that we review *de novo*; but the court must give great deference to the issuing magistrate judge's probable cause determination. *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc); *see also United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001).

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)). Based on the affidavit, which must be reviewed in a commonsense and not a hypertechnical manner, the question is whether the issuing magistrate judge had a substantial basis for finding probable cause. *See Brown*, 732 F.3d at 573; *Greene*, 250 F.3d at 478-79; *Allen*, 211 F.3d at 973. Here, the district court found that the affidavit provided "sufficient basis for the magistrate judge to conclude that there was a fair probability that evidence of narcotics trafficking or the fruits of illegal activity would be found at 727 W. Grand Blvd., Apt. 312." We agree.

As the district court explained, Task Force Officer Shawn Reed's affidavit attested to his considerable experience in narcotics interdiction and concluded that the activities observed were consistent with those of a drug trafficking organization. Specifically, the affidavit related with particularity information about the interception of the five kilograms of cocaine concealed in the spare tire of the Silverado; the arrangement for the controlled delivery of the sham cocaine; and the surveillance of the delivery and subsequent transport of the Silverado with the contraband by caravan to the apartment building at 727 West Grand Boulevard. Reed stated in his affidavit that

the Silverado with the sham cocaine and the Pathfinder "parked in the rear of 727 W. Grand Blvd.," where "the subjects" Samaniego, Galindo, and Daniels were detained as they were "removing the spare tire, containing the kilograms, from the 1999 Silverado." Further, the affidavit stated that Daniels "produced a Michigan Identification card with the address of 727 W. Grand Blvd. apartment 312," which was "the same location the kilograms were transported to by Samaniego."

Thus, the information in Officer Reed's affidavit provided a connection between the criminal activity and the apartment where Daniels said he resided and also where Daniels, Samaniego, and Galindo brought the Silverado after the controlled delivery and began removing the spare tire containing the sham cocaine when they were interrupted and placed under arrest. The district court did not err in concluding that the affidavit provided a substantial basis for the magistrate judge to find a fair probability that contraband or evidence of a crime would be found in the place to be searched.[5]

### B.      *Brady* Violation

Kemp argues on appeal that the government's disclosure of the redacted portions of Sanchez's proffer statement during trial violated *Brady v. Maryland*, 373 U.S. 83 (1963). Since defense counsel did not seek a mistrial or assert a *Brady* claim in the district court, our review is for plain error. *See United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004). This claim fails because there was no error—much less plain error.

To establish a *Brady* violation, Kemp must show that the prosecutor suppressed evidence, that the evidence was favorable to the defense, and that the suppressed evidence was material. *See United States v. Fields*, 763 F.3d 443, 458 (6th Cir. 2014). "Materiality pertains to the issue

---

[5]The district court also concluded, in the alternative, that even if probable cause was lacking, the good-faith exception to the exclusionary rule recognized in *United States v. Leon*, 468 U.S. 897 (1984), would apply. Although Kemp attacks this conclusion as well, we need not address those arguments.

of guilt or innocence, and not to a defendant's ability to prepare for trial." *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994) (citing *United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976)). In other words, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (citation omitted).

There is no dispute that the government provided defense counsel with only redacted versions of the reports of Sanchez's proffer prior to trial. There is also no dispute, however, that unredacted copies of those reports were provided to defense counsel as Sanchez was being called to testify on November 1, 2016. Importantly, for this and other reasons, the district court adjourned trial after Sanchez testified on direct examination and trial did not resume until November 8, 2016. Kemp argues that the previously redacted information was favorable to his defense because it revealed that Sanchez had told the DEA he was also shipping narcotics to Detroit for individuals unrelated to this case during June or July 2015. In fact, when trial resumed, Kemp's counsel used that information to impeach Sanchez on cross-examination. When "the United States ultimately hands over the *Brady* material that could be used to impeach a witness," "there is no violation 'so long as the defendant is given [the] impeachment material, even exculpatory impeachment material, in time for use at trial.'" *Fields*, 763 F.3d at 458 (quoting *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988)).

## C.    Prosecutorial Misconduct

In reviewing a claim of prosecutorial misconduct, this court determines first whether the statement was improper and, if so, whether the impropriety was so flagrant as to warrant reversal. *See United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011). We consider four factors in determining whether a prosecutor's improper remarks were flagrant: "(1) the degree to which

the conduct or remarks tended to mislead the jury or prejudice the defendant; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally put before the jury; and (4) the overall strength of the evidence against the defendant." *Id*. Where, as here, however, no objection was made at trial, this claim is reviewed only for plain error. *Id*. Under the plain-error standard, the defendant must demonstrate (1) error, (2) that was obvious or clear, (3) that affected his substantial rights, and (4) that "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006) (quoting *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)).

Here, Kemp claims prosecutorial misconduct requiring reversal resulted because the prosecutor misstated the evidence during closing arguments. Specifically, counsel for the government argued, at one point, that the evidence showed Kemp was the only defendant who had an iPhone. The government concedes on appeal that the evidence actually showed that Kemp and Plunkett each had a cell phone when they were arrested, and that Plunkett's was an iPhone. That misstatement of fact was followed by two related arguments: first, that Kemp's cell phone had the same number that Samaniego had used to text "O"; and, second, that the heroin found in the apartment that formed the basis for the charge in Count III had been hidden in an empty iPhone box.

Turning to the other factors, the misstatement of fact did not make the first argument misleading because it was not dependent on the kind of cell phone Kemp had when he was arrested. Rather, the inference the government sought had to do with the phone number associated with Kemp's phone. The government's second argument was misleading because it urged the jury to infer from the misstated fact that Kemp had possessed the heroin that was hidden in the iPhone box. However, without weighing the other flagrancy factors, we conclude

that this improper argument did not affect Kemp's substantial rights because he was acquitted of the charge that related to the heroin found in the iPhone box. Kemp cannot establish a claim for prosecutorial misconduct under the plain-error standard of review.

**IV.**

Kemp does not challenge the substantive reasonableness of his below-Guidelines sentence of 180 months of imprisonment. Rather, he argues that his sentence was procedurally unreasonable because the district court miscalculated his applicable Guidelines range. When considering the procedural reasonableness of a sentence, we review the district court's factual findings for clear error and mixed questions of law and fact *de novo*. *See United States v. Groenendal*, 557 F.3d 419, 422-23 (6th Cir. 2009).

**A.      Base Offense Level**

Defense counsel objected to the recommended base offense level of 32, which corresponded to a finding that Kemp was responsible for at least 15 but not more than 50 kilograms of cocaine. *See* USSG § 2D1.1(a)(5) and (c)(4). Kemp argued that he should be held accountable only for the amount of cocaine found in the Silverado, which would result in a base offense level of 30. In support of this claim, defense counsel argued that the jury must not have believed the testimony from the cooperating witnesses because Kemp was acquitted of the broader conspiracy charged in Count I. The district court acknowledged the acquittal but recognized that the preponderance of the evidence standard applied to the quantity determination to be made for purposes of the Guidelines calculation. *See United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004). A district court's quantity determination "may be based on physical evidence (such as seized drugs) or testimonial evidence." *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). The district court's factual findings are reviewed for clear error, and its

credibility determinations are entitled to deference. *See id.*

There was competent evidence that, if believed, established that Kemp had received a total of 25 kilograms of cocaine in three shipments for distribution in Detroit. The district judge specifically found that the cooperating witnesses were credible, and concluded that Kemp "was clearly involved on more than the one occasion he was convicted of," had flown to Detroit to receive the cocaine at least twice, and was clearly connected to the loft apartment where evidence of the conspiracy was found and from which Sanchez testified cocaine was distributed. Kemp cannot show that the district court clearly erred in finding that Kemp was responsible for at least 15 but not more than 50 kilograms of cocaine.[6]

### B.      Role-in-the-Offense Adjustment

Under USSG § 3B1.1(a), a four-level increase in the offense level applies if the defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." A defendant need only be a leader of "one or more other participants," *id.*, at comment. (n.2); and there can be "more than one person who qualifies as a leader or organizer of a criminal association or conspiracy," *id.*, at comment. (n.4). The factors to consider include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.*, at comment. (n.4). This court has clarified that we must "accord deference to the [district court's] legal conclusion that a person is an organizer or leader under [§] 3B1.1." *United States v. Olive*, 804 F.3d 747, 759 (6th Cir. 2015) (citing *United States v. Washington*, 715 F.3d 975, 982-83 (6th Cir. 2013)).

---

[6]The Sixth Amendment did not prevent the district court from relying on acquitted conduct since this quantity determination did not affect the statutory minimum or maximum. *See, e.g.*, *United States v. Roman-Oliver*, 564 F. App'x 156, 166-67 (6th Cir. 2014).

Kemp objected to this upward adjustment, arguing that the evidence established, at most, that he "was merely a lookout, or an individual conducting counter-surveillance" and that "no credible evidence presented to the jury (even based on a preponderance of the evidence) [] established that Mr. Kemp was an organizer or leader of criminal activity that involved five or more participants." However, the district judge explained that he believed the testimony of the cooperators and found that Kemp was making trips to Detroit for the purpose of facilitating and helping to organize the three cocaine transactions. As for the claim that Kemp was "merely a lookout," the district judge added that Kemp "wasn't fooling anybody about what he was [in Detroit] for," and found by a preponderance of the evidence that Kemp "was intimately involved with the management and organization of the conspiracy and was a leader of it." The evidence amply supports the district judge's assessment that Kemp was an organizer or leader of the joint criminal activity, and we defer to that conclusion.

Lastly, Kemp argues for the first time on appeal that the district court failed to make the necessary finding that the criminal activity involved five or more participants. (Def's Bf., p. 46.) Defendant did not object on that basis or argue that there actually were less than five participants, despite having had the opportunity to object before sentence was imposed. For that reason, Kemp has forfeited the ability to challenge the failure to make specific findings, and we review the claim that there were not five participants for plain error. *See United States v. Vonner*, 516 F.3d 382, 385-87 (6th Cir. 2008) (en banc). This hurdle cannot be overcome here, however, where it is undisputed that convictions were secured against Kemp, Daniels, Plunkett, Samaniego, and Galindo for participation in the jointly undertaken criminal activity.

*            *            *

For the reasons stated, Kemp's conviction and sentence are **AFFIRMED**.